JUDGE COTE



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

ANDREW CURRY,

                    Plaintiff,

      -against-

Volt Information Sciences, Inc. and
Volt Telecommunications Group, Inc.

                 Defendants.

----------------------------------------------------------------

Civil Action No.

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

Plaintiff Andrew Curry, by his attorneys Beranbaum Menken Ben-Asher & Bierman LLP, alleges as follows:

1.  This is an action arising under the Sec. 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A.

2.  Plaintiff Andrew Curry alleges that defendants terminated his employment and otherwise retaliated against him because he engaged in activity protected under Sec. 806.

4.  Plaintiff seeks declaratory and injunctive relief, including reinstatement to his position and all lost benefits of his employment, and special damages as permitted under Sec. 806.

## JURISDICTION AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.  This action arises under Sec. 806 of the Sarbanes-Oxley Act of 2002, 18 U.S. Sec. 1514A.

6.  Plaintiff has complied with all procedural requirements of Sec. 806 prior to filing this complaint.

7. Plaintiff timely filed a charge against defendants under Sec. 806 with the United States Department of Labor, Occupational Health and Safety Administration (Case No. 2 - 4173 - 06 - 058) on September 19, 2006, within 90 days after the date plaintiff was advised by defendants of the termination of his employment, in accordance with Sec. 806, 18 U.S.C. 1514A(b)(2)D).

8. More than 180 days have passed since plaintiff filed his charge with the Department of Labor (DOL), and DOL has not issued a final decision within the meaning of 18 U.S.C. Sec. 1514A(b)(1)(B).

9. On February 14, 2007, OSHA determined that there was not reasonable cause to conclude that defendants had violated Sec. 806. Plaintiff's counsel received this determination on February 15, 2007. OSHA did find that plaintiff had engaged in protected activity within the meaning of Sec. 806, that he had a reasonable belief that he was reporting fraud on VTG's shareholders, and that defendant VTG had known of his protected activity.

10. On March 15, 2007, plaintiff filed timely objections to OSHA's decision, in accordance with the regulations of the Department of Labor, 29 CFR Part 1980.

11. On May 9, 2007, as permitted by Sec. 806, plaintiff's counsel wrote the Department of Labor that plaintiff intended to file a complaint for de novo review in federal court, and requested that DOL terminate its proceedings concerning Mr. Curry's charge,

12. This Court has jurisdiction over this action pursuant to 18 U.S.C. Sec. 1514A(b)(1)(B) and 28 U.S.C. 1331.

-2-

PARTIES AND VENUE

13.  Plaintiff Andrew Curry is a resident of the State of New York, residing at 7259 Shore Road, Brooklyn, N.Y. 11209.

14.  For eight years prior to his termination, Mr. Curry was the Director of the Management Services Group at defendant Volt Telecommunications Group, Inc.

15.  Defendant Volt Information Sciences, Inc. ("VIS") is a publicly traded corporation. It has a class of shares registered under Sec.12 of the Securities Exchange Act of 1934, 15 U.S.C. 78l, and is required to file reports under Sec. 15(d) of the Securities and Exchange Act of 1934, 15 U.S.C. 78o(d).   It is incorporated in New York, and has its headquarters at 560 Lexington Avenue, New York, N.Y. 10022.  VIS is a Fortune 1000 company, with annual revenues exceeding $2 billion.

16.  Defendant Volt Telecommunications Group, Inc. ("VTG") is a wholly owned subsidiary of defendant Volt Information Sciences., Inc.  VTG has offices in Corona, California and at numerous other locations in the U.S. and internationally, including 560 Lexington Avenue, New York, N.Y. 10022.  It is incorporated in State of Delaware. VTG designs, engineers, constructs, installs and maintains voice, data and video infrastructures for both the private sector and government agencies.  VTG has over 1,000 employees, and provides services nationally and internationally.

17.  Venue is therefore proper in this District, pursuant to 28 U.S.C. 1391(b), in that defendants are residents of this District, and a substantial part of the events giving rise to plaintiff's claims occurred in this District.

18.  The value and performance of VIS is based, in part, on the value and performance of VTG; VTG and VIS share a common management and purpose; and VTG is also an agent of VIS.

-3-

## FACTUAL ALLEGATIONS

19. Plaintiff Andrew Curry has more than 35 years experience in the telecommunications industry.

20. Before he was terminated by defendants, Mr. Curry had been continually employed since April, 1971.

21. Mr. Curry was hired by defendants in March, 1998, as Volt's Director of Management Services.

22. The Management Services group had five members, including Mr. Curry. The other members, all of whom reported to him, were Senior Quality Systems Managers Lisa Covell and Charles Calv, Quality Systems Manager Lisa Eckhart, and Licensing Manager Andrew Zelner.

23. The Management Services group was responsible for implementing Volt Telecommunications Group's compliance with international and industry-wide standards called ISO 9001 and TL 9000.

**The international and industry-wide standards implemented by Mr. Curry's group**

24. The ISO standards were developed by the International Organization for Standardization (ISO), which determines standards for businesses world wide. ISO's standards range from mechanical ones (for example, how threads on various screw sizes are made) to business management standards (procedures for businesses to follow in management, accounting and financial transactions.) See the ISO website, at www.iso.org, and more specifically the introductory material at http://www.iso.org/iso/en/aboutiso/introduction/index.html. The ISO 9001 standard is

-4-

primarily concerned with "quality management," which concerns the customer's quality requirements, continuous improvement programs to ensure that those requirements are achieved, and applicable regulatory requirements. See http://www.iso.org/iso/en/iso9000-14000/understand/inbrief.html.

25. The TL 9000 standards are specific to the information technology and telecommunications industries. The TL 9000 standards define the requirements for the design, development, production, delivery, installation and maintenance of telecommunications products and services. They include procedures for contract administration, purchases of materials, and subcontractor services. They also provide a measurement system that allows companies to track performance and improve results. See http://tl9000.org/

26. The TL 9000 standard was developed by the QuEST Forum (the "Quality Excellence for Suppliers of Telecommunications Forum") The QuEST Forum is a group of the leading telecommunications and IT companies, including AT&T, Bell Canada, Deutsche Telecom, France Telecom, Verizon, 3M, Cisco Systems, Ericsson, Fujutsu, Hitachi, Motorola, NEC, Nokia, Siemens, and many others. It also includes major accrediting and standard-setting organizations from many countries. See http://www.questforum.org/membership/mm_dir.jsp. QuEST used the ISO 9001 standards as its foundation for the TL 9000 Quality Management System, and added requirements particular to the telecommunications and IT industries. Hundreds of companies adhere to these TL 9000 standards. Most major telecommunications and IT companies require both ISO 9001 and TL 9000 certifications as a requirement for their suppliers.

**Registration, certification and audit procedures**
**relevant to Mr. Curry's responsibilities**

27. Telecommunications companies that demonstrate compliance with the TL 9000 standard are investigated by an accredited "Registrar," which reviews the company's written procedures. If the Registrar approves the procedures, the company is considered "registered." In the next step, a QuEST certified auditor then visits the company and conducts an intensive Registration Audit to determine whether it is actually adhering to these written standards. If so, the company is confirmed by the Registrar to be in compliance with the TL 9000 standard, and is recommended to the QuEST Forum for formal certification as a TL 9000 company. See http://tl9000.org/tl_reg-prcss.htm. This certification process can take six to eighteen months. See http://tl9000.org/tl_faq-b.htm.

28. ISO 9001 certification is a pre-requisite for TL 9000 certification. The ISO 9001 certification process, which must precede the TL 9000 certification, can take from eighteen months to three years.

29. Once the company is certified, the ISO 9001 and TL 9000 standards require two types of ongoing audits. One is an annual "Surveillance Audit" by the TL 9000 registrar, to ensure that the company continues to comply with the standard. The company must also do regular internal audits of its ISO 9001 and TL 9000 compliance.

**Volt's registration, certification and audits**

30. Before Mr. Curry joined VTG, none of these procedures or approvals were in place at VTG. Volt had neither adopted the ISO 9001 standards, registered its procedures, or been certified after an audit as ISO 9001 compliant.

-6-

31. Mr. Curry's group was responsible for implementing these requirements, and ensuring that Volt continued to adhere to the ISO 9001 standards. Before Mr. Curry's employment, VTG's Central Office (CO) Division had advised its principal customer, AT&T, that it was completing ISO 9001 certification, although VTG had not initiated any action to obtain this certification.

32. Mr. Curry's group developed VTG's ISO 9001 Standard Operating Procedures, which were Volt's procedures for following the ISO 9001 standards, as well as the required Quality Policy and detailed Work Instructions documentation. These were submitted to the ISO 9001 registrar, which reviewed them, registered VTG, audited VTG's adherence to the Procedures, Quality Policy and Work Instructions, and then recommended VTG to the ISO for ISO 9001 certification.

33. Before submitting VTG's ISO 9001 Standard Operating Procedures for registration, Mr. Curry's group performed "Pre-Registration Audits" on Volt's procedures, to ensure VTG was complying with them. Once VTG was certified, it also performed internal audits on each internal organization and at each location, several times a year to evaluate compliance. This group also conducted weekly, semi-monthly and monthly Steering Committee meetings with each certified unit to direct the development of Continuous Improvement Programs. The same process was followed for the TL 9000 certification of VTG's Central Office division, its Verizon Corporate Telecommunications Services (VCTS) division, and its Contract Administration and Procurement Management division (CAPM).

34. Beginning in 2005, Mr. Curry's group audited four locations in Volt's Central Office, one in Volt's VCTS unit in Dallas, and Volt's CAPM division in Raleigh-Durham. There were at least two audits scheduled in 2005 for each location. Each audit

took several weeks, with a typical Pre-Registration audit lasting three to four weeks, and a post-certification internal audit lasting two weeks. Audits were conducted both on-site and "virtually," but the form of the audit did not affect how long it took to complete. Mr. Curry had introduced "virtual" audits to reduce his group's travel expenses.

**Mr. Curry's protected activity under Sec. 806**

35. Between February, 2005 and May, 2006, Mr. Curry engaged in activity protected by Sec. 806.

36. Mr. Curry provided information, caused information to be provided and otherwise assisted in an investigation of conduct by defendants which Mr. Curry reasonably believed constituted a violation of the provisions listed and described in 18 U.S.C. 1514A(a)(1), including fraud on VIS's shareholders; in addition, by his investigation and complaints concerning such conduct, Mr. Curry participated or otherwise assisted in a proceeding about to be filed, within the meaning of 18 U.S.C. 1514A(a)(2).

37. Mr. Curry's protected activity included the following:

**Mr. Curry's 2005 audits of CAPM**

38. In March, 2004, the then President of Volt Telecommunications, William Braunlich, asked Mr. Curry's MS group to review VTG's financial performance.

39. Mr. Curry's staff performed several analyses and recommended corrective actions to Mr. Braumlich and his Controller on February 28, 2005. A copy of this report was forwarded to Assistant General Counsel Lisa Valentino in April, 2005, at her request.

40. The Contract Administration and Procurement Management Division

(CAPM) requested ISO 9001 and TL 9000 certification in April, 2004. As part of this process, Mr. Curry's group produced audit reports of CAPM on April 8, 2005, June 29, 2005 and September 28, 2005, which found serious deficiencies in VTG's compliance with Volt's Sarbanes-Oxley ("SOX") procedures regarding contract administration, engagement of subcontractors and procurement of materials. Mr. Curry's reports specifically and extensively referred to Volt's SOX procedures.

41. VTG's CAPM Standard Operating Procedures (SOP's) for purchases of materials and for engagement of subcontractors specifically rely on VTG's Sarbanes-Oxley compliance procedures. VTG's internal controls for contracts and accounts payable, as required by Sec. 404 of SOX, were included in CAPM's ISO 9001 and TL 9000 Standard Operating Procedures.

42. Mr. Curry's audits found wide-ranging improprieties in the payments made to contractors and the purchases of materials.

43. These improprieties were material, in that the costs associated with them, as Mr. Curry repeatedly noted in his subsequent internal complaints, ran into the millions of dollars, a significant cost in a company which had not been profitable for several years.

44. In July, 2005, Mr. Braunlich was replaced as VTG's President by R. J. Anderson, who was Senior Vice President in VTG's Construction and Engineering Division. Most of Mr. Curry's audit findings concerned Mr. Anderson's division, and Mr. Anderson was hostile to Mr. Curry's auditing and compliance work on these issues. Over the next year, he worked to undermine Mr. Curry's authority, finally terminating him in June, 2006.

**Mr. Curry's complaint to Volt Information Science's CEO**

45. On August 8, 2005, Mr. Curry wrote to Volt Information Science's CEO, William Shaw, discussing how his audits had found "deficiencies that could represent a [m]aterial [w]eakness in our internal financial controls" and noting that "fraudulent activity" might be involved."

46. Mr. Curry had several meetings with Volt's Vice President of Internal Accounting during the summer of 2005 to discuss his findings.

**Mr. Curry's provision of information to the
New York State Attorney General**

47. In November, 2005, Mr. Curry provided information to and met with the New York State Attorney General's office (Harold Wilson) concerning his group's audit findings. He provided the AG's office with copies of the audits, which found extensive improprieties in VTG's subcontracting and the purchase of materials. Mr. Curry also discussed allegations of payroll tax improprieties by Volt.

**Complaint to IRS regarding payroll tax fraud**

48. On October 3, 2005, Mr. Curry filed a complaint of payroll tax fraud by Volt with the Internal Revenue Service, a federal law enforcement authority with the power to investigate fraud under Sec. 806. Mr. Curry met with the IRS on November 30, 2005. Mr. Curry also raised this complaint internally, by writing VIS President William Shaw, among others, that VTG was improperly using per diem payments to employees to significantly reduce payroll costs. Mr. Curry reasonably believed that the improper payments were material to VTG's and VIS's financial condition.

**Mr. Curry's complaint to Volt's General Counsel**

49. On July 20, 2005, in memo titled "Request for Whistleblower [P]rotection,"

-10-

Mr. Curry wrote Volt Information Science's General Counsel, Howard Weinreich,
referring to his group's audits finding "significant deficiencies in VTG's Sarbanes/Oxley
management controls and serious variances with several corporate accounting / financial
policies." He also said there were "strong indications of fraudulent activities related to
purchases of materials and subcontractor services." He requested "protection from
retaliation." He made a further request to Mr. Weinreich for whistleblower protection on
August 9, 2005.

### Mr. Curry's internal complaint of retaliation

50. Mr. Curry made several complaints concerning Mr. Anderson's introduction
of a new policy precluding telecommuting. He reasonably believed that this policy was
being selectively enforced against his Management Systems group.

51. On October 28, 2005, Mr. Curry wrote General Counsel Howard Weinreich
(with copies to CEO William Shaw and other executives), saying the policy change was
retaliation for his group's raising of issues regarding "internal financial controls [and]
illegal activities." He said that Volt's failure to "take appropriate corrective actions and
hold senior managers accountable for ignoring internal financial controls...[and] illegal
activities" represented "a serious disservice to our shareholders." He stated that he
would be filing a charge under Sarbanes-Oxley with the Department of Labor.

52. Mr. Curry also prepared a list of VTG employees he had randomly checked,
showing that the majority of these employees – whose one way commutes ranged from 4
to 48 miles – were permitted to telecommute, although Mr. Curry's employees'
commutes were far lengthier.

53. On December 19, 2005, Mr. Curry wrote VIS CEO William Shaw and the
independent members of the Board that he would be filing a complaint with DOL under

-11-

Sec. 806, based on the application of the new telecommuting policy. He stated that the
telecommuting policy was in retaliation for the audits that had identified deficiencies in
Volt's Sarbanes-Oxley compliance and payroll tax fraud which improperly reduced
Volt's direct costs. He stated the Volt had failed to honor previous requests he had made
for "whistleblower" status. Mr. Curry requested an independent investigation of all of
these issues.

54. In May, 2006, Mr. Curry wrote VTG President R. J. Anderson, concerning
the telecommuting policy, and again advising of his belief that VTG was violating
requirements of the Sarbanes-Oxley Act.

55. Defendants were aware of plaintiff's protected activity under Sec. 806.

**Volt's retaliatory actions**

56. Following Mr. Curry's 2005 audits and the other protected activity in which
he engaged through May, 2006, defendants took a series of retaliatory actions against
Mr. Curry, in retaliation for his protected activity under Sec. 806, which culminated in
his termination on June 23, 2006.

57. VTG's new CEO, R. J. Anderson, first proposed the elimination of Mr.
Curry's Management Services Group, ostensibly as part of a company-wide cost
reduction, in July, 2005, following Mr. Curry's submission of the April and June, 2005
audit findings.

58. Beginning in January, 2006, Mr. Anderson selectively enforced Volt's new
policy against telecommuting, negatively impacting the members of Mr. Curry's
Management Services group, and exempting employees in other groups whose
commuting distances were far less.

-12-

59. Mr. Anderson directed Mr. Curry to reduce his Management Services budget by fifty per cent, which resulted in the transfer of two employees to other divisions (Senior Quality Systems Manager Charles Calv and Licensing Manager Andrew Zelner). This did not reduce operating expenses for VTG, since there was no change in these two employees' responsibilities or compensation.

60. Finally, on June 23, 2006, defendants, by Mr. Anderson, terminated Mr. Curry's employment, ostensibly as a cost-cutting measure.

61. Defendants' purported cost-cutting rationale for terminating Mr. Curry was a pretext for their actual motive, which was to retaliate against Mr. Curry for his repeated protected activity under Sec. 806.

62. Mr. Curry was the only member of his group who was fired. As described above, two others had been previously transferred to other divisions and retained their existing responsibilities, so Volt realized no savings concerning them. A fourth had resigned in May, 2006, before Mr. Curry was terminated (Senior Quality Systems Manager Lisa Covell). Volt left in place the group's least experienced and qualified member, Quality Systems Manager Lisa Eckhart, also saving no costs.

63. Defendants' termination of Mr. Curry, and the other actions described in paragraph 56 through 62 above, were in retaliation for Mr. Curry's protected activity under Sec. 806.

64. Defendant VIS was involved in, and approved of, the retaliatory actions taken against plaintiff by VTG.

65. Volt's financial results for its 2006 Fiscal Year showed that at the time the termination decision was made, VTG was profitable. For the nine months (first three quarters) ending July 31, 2006, VTG had a profit of $539,000.

-13-

66. Only two weeks before Mr. Curry was fired, VTG President Anderson sent an e-mail to all his direct reports, celebrating "another positive month" for VTG.

67. Thus, at the time Mr. Curry was fired, defendants had no legitimate fiscal reasons to terminate him.

68. Volt Information Sciences as a whole reported an increase in its net income for Fiscal Year 2006 over 2005, from $17 million to $30 million. In the third quarter, when Mr. Curry was fired, Volt Information Sciences had a profit of $8.4 million, compared to $5 million in the third quarter of 2005.

69. In addition, Mr. Curry had taken major steps to reduce even the bare-bones overhead of his group. The use of virtual, as opposed to on-site audits, was a significant cost-cutting measure, and the use of PC-based training materials further cut on-site travel costs. The telecommuting done by Mr. Curry's staff also saved VTG significant office overhead.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of Sec. 806 of the Sarbanes-Oxley Act.

70. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 69 above.

71. Defendants terminated plaintiff's employment and engaged in other discriminatory conduct which was in retaliation for lawful acts taken by plaintiff constituting protected activity under 18 U.S.C. 1514A(a).

72. By engaging in such retaliatory conduct, defendants violated Sec. 806 of the Sarbanes-Oxley Act, 18 U.S.C. 1514A.

WHEREFORE, Plaintiff requests that this Court enter an order:

1.  Declaring that defendants violated Sec. 806 of the Sarbanes-Oxley Act;

2.  Pursuant to 18 U.S.C. 1514A(c), awarding plaintiff all relief necessary to make plaintiff whole, including reinstatement to his position with seniority, back pay with interest, the value of all lost employment benefits, and front pay;

3.  Pursuant to 18 U.S.C. 1514A(c), awarding plaintiff special damages, including litigation costs, expert witness fees, reasonable attorney's fees, and damages for injury to reputation and for emotional distress;

4.  Granting such other and further relief as permitted by law.

JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury of this action.

Dated:   New York, N.Y.
         August 10, 2007

BERANBUAM MENKEN BEN-ASHER & BIERMAN LLP
Attorney for Plaintiff Andy Curry

By: _____

JONATHAN BEN-ASHER  (JB-A  4572)
KRISTEN FINLON (KF 2575)

80 Pine Street - 32nd floor
New York, N.Y. 10005
Telephone: (212) 509-1616
Facsimile:  (212) 509-8088