UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANDREW CURRY,

                        Plaintiff,                    Civil Action No. 07 CV 7158 (DC)

     -against-

VOLT INFORMATION SCIENCES, INC. and
VOLT TELECOMMUNICATIONS GROUP, INC.,

                        Defendants.
-------------------------------------------------------------X

## DEFENDANTS' NOTICE OF MOTION TO COMPEL
## ARBITRATION AND STAY THIS ACTION

PLEASE TAKE NOTICE, that upon the accompanying memorandum of law, the

affidavit of Louise Ross, sworn to on November 9, 2007, and the exhibits annexed thereto,

defendants Volt Information Sciences, Inc. and Volt Telecommunications Group, Inc. will

move this Court at 500 Pearl Street, Courtroom 11B, New York, New York, to be returnable

in accordance with Local Rule 6.1(d) of the Local Rules of the United States District Court

for the Southern District of New York, for an order pursuant to Federal Arbitration Act

("FAA"), 9 U.S.C. § 3: (i) compelling the plaintiff, Andrew Curry ("plaintiff" or "Curry ) to

submit the claims alleged in the Complaint to arbitration on the ground that all of the claims

are subject to a written agreement to arbitrate; (ii) staying this action; and (iii) such other and

further relief as this Court deems just and proper.

-1-

Dated: New York, New York
       November 9, 2007

TROUTMAN SANDERS LLP

By:_____
      Sharon H. Stern (SS-3788)
      405 Lexington Avenue
      New York, New York 10174
      (212) 704-6000
      *Attorneys for Defendants*
      *Volt Information Sciences, Inc. and*
      *Volt Telecommunications Group, Inc.*

To:    Jonathan Ben-Asher, Esq.

ROSS AFF.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANDREW CURRY,

                      Plaintiff,                        Civil Action No. 07 CV 7158 (DC)

    -against-                                     **<u>AFFIDAVIT OF LOUISE ROSS</u>**

VOLT INFORMATION SCIENCES, INC. and
VOLT TELECOMMUNICATIONS GROUP, INC.,

                        Defendants.
------------------------------------------------------------X

STATE OF NEW YORK   )
                          ) ss.:
COUNTY OF NEW YORK  )

      **LOUISE ROSS,** being duly sworn, deposes and says:

      1.      I am the Vice President of Human Resources of defendant Volt Information Sciences, Inc. ("Volt"). I have personal knowledge of the facts stated herein and I submit this affidavit in support of the motion by defendants Volt Information Sciences, Inc. ("Volt")and Volt Telecommunications Group, Inc. ("VTG") (collectively, the "Defendants") for an order pursuant to Federal Arbitration Act ("FAA"), 9 U.S.C. § 3:  (i) compelling the plaintiff, Andrew Curry ("plaintiff" or "Curry"), to submit the claims alleged in the Complaint to arbitration on the ground that all of the claims are subject to a written agreement to arbitrate; (ii) staying this action; and (iii) such other and further relief as this Court deems just and proper.

      2.      Defendant Volt is a public company whose stock is listed on the New York Stock Exchange. Volt is engaged in the business of providing products and services including: skill testing and training services; technical services and temporary personnel;

telecommunications services; operator services systems and information services; computer and network services; web site design and program management and consulting.

3.      Defendant VTG, a wholly owned subsidiary of Volt, is the telecommunications segment of Volt's business, providing telecommunications services.

4.      Plaintiff commenced this action by filing the Complaint on August 10, 2007. A copy of the Complaint is annexed hereto as Exhibit "A."

5.      In this action, Plaintiff asserts claims of allegations of discriminatory employment practices in violation of Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, et. seq. ("SOX"). Plaintiff asserts that his employment as Director of the Management Service Group of VTG was terminated in 2006 and that he was otherwise retaliated against because he allegedly engaged in protected activity under Section 806 of SOX.

6.      The Defendants dispute the allegations of the Complaint and believe that Plaintiff's claims are wholly without merit. Annexed hereto as Exhibit "B" is a copy of Defendant's answer, asserting among other defenses, that the parties agreed to arbitrate employment disputes. No discovery has yet taken place in this action.

7.      In his complaint, Plaintiff wholly disregards that Plaintiff was provided with the employee handbook of Volt, including its subsidiary VTG and Volt's other subsidiaries and divisions (the "Volt Employee Handbook"). The Volt Employee Handbook contains a broad arbitration provision at pages 20-21 thereof, stating that all employment related claims will be subject to mandatory arbitration. The broad arbitration provision in the Volt Employee Handbook states as follows:

## ALTERNATIVE DISPUTE RESOLUTION

"Volt believes that alternative dispute resolution is the most efficient and mutually satisfactory means of resolving disputes between Volt and its employees. **Any dispute, controversy or claim which was not settled through the Concerns and Issues Procedure and arises out of, involves, affects or relates in any way to any employee's employment or a claimed breach of the employment relationship or the conditions of your employment or the termination of your employment, including but not limited to disputes controversies of claims arising out of or relating to the actions of Volt's other employees, under Federal, State and/or local laws shall be resolved by final and binding arbitration. The applicable rules of the applicable rules of the American Arbitration Association in the state where employee is or was last employed by Volt shall prevail.**

The arbitrator shall be entitled to award reasonable attorneys' fees and costs to the prevailing party. The award shall be in writing, signed by the arbitrator, and shall provide the reasons for the award. The Arbitration may provide for any remedies that would be available in a comparable judicial proceeding, unless such remedies are precluded under state law. This does not prevent you from filing a charge or claim with any governmental administrative agency as permitted by applicable law. (Emphasis added).

**Arbitration is an essential element of your employment relationship with Volt and is a condition of your employment ...**" (Emphasis added).

A copy of Volt Employee Handbook is annexed hereto as Exhibit "C."

8. On March 13, 2002, Plaintiff signed an acknowledgement that he received the Volt Employee Handbook (the "Acknowledgment"). A copy of the Acknowledgment is annexed hereto as Exhibit "D." The Acknowledgment not only set forth that Plaintiff received the Volt Employee Handbook, but in addition, stated that he read, understood and agreed to be "bound" by the arbitration provisions in the Volt Employee Handbook and "expressly waive[d] his right to sue the Company ... in court" and that he agreed to submit to final and binding

3

arbitration any dispute arising between him and the Company. The Acknowledgment states, in pertinent part:

> "I have read, understand and agreed to be bound by the Company's Discrimination Complaint Procedure, including Arbitration and expressly waive my right to sue the Company, its agents and employees in court and I agree to submit to final and binding arbitration any dispute, claim or controversy arising between me and the Company that I would have been otherwise entitled to file in court."

9.     As demonstrated in the accompanying memorandum of law, arbitration of plaintiff's claims should be compelled and this action stayed under the FAA and the strong federal policy favoring arbitration agreements.[1] The plain and unambiguous language of the signed Acknowledgment, along with the Volt Employee Handbook, evidences an objective manifestation of assent to arbitration by Plaintiff, as well as a waiver of his right to assert the claims at issue in court.    In addition, as more fully discussed in the accompanying memorandum of law, courts in this district routinely uphold arbitration agreements contained in employee handbooks where, as here, the employee has signed an acknowledgement form.

10.    The Volt Employee Handbook also makes plain that the arbitration of disputes is an "essential" condition of employment, which Plaintiff accepted when he continued to work for four years after his receipt of the Volt Employee Handbook and signing of the Acknowledgment. Thus, Plaintiff manifestly agreed to arbitrate.

11.    Furthermore, the arbitration agreement is a broad one that unquestionably covers the claims advanced in the Complaint.    Pursuant to the Volt Employee Handbook and Acknowledgment, Plaintiff is required to arbitrate all disputes "aris[ing] out of, involv[ing],

---

[1] Here, there can be no dispute about the applicability of the FAA. As an employee of VTG, Plaintiff's duties encompassed transactions involving interstate commerce. He was required to use and did use various instrumentalities of interstate commerce, including the mail, telephones and various electronic telecommunications systems.

affect[ing] or relat[ing] in any way to … employee's employment or a claimed breach of the employment relationship or the conditions of … employment or the termination of … employment, including but not limited to disputes controversies of claims arising out of or relating to the actions of Volt's other employees, under Federal, State and/or local laws…" All of the claims contained in Plaintiff's Complaint arise out and relate to his employment, his conditions or termination of employment  and/or the actions of Volt's other employees under federal and state laws and, therefore, they fall within the scope of the arbitration agreement.  As discussed in the accompanying memo of law, it is well established that whistleblower claims under SOX and similar claims under Title VII and comparable New York statutes are arbitrable.  Thus, if the Plaintiff wishes to pursue his claims, he must do so through arbitration.

**WHEREFORE**, it is respectfully requested that Defendants' application for an order staying this action and compelling Plaintiff to submit his claims to arbitration be granted in all respects.

*Louise Ross*

Louise Ross

Sworn to before me this
9 +h day of November, 2007

*Lisa Valentino*
Notary Public

LISA VALENTINO
Notary Public, State of New York
No. 02VA6043112
Qualified in New York County
Commission Expires June 12, 2009

6

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CV 7158

JUDGE COTE

------------------------------------------------------

ANDREW CURRY,

                    Plaintiff,

        -against-

Volt Information Sciences, Inc. and
Volt Telecommunications Group, Inc.

                    Defendants.

------------------------------------------------------

Civil Action No.

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

FILED
U.S. DISTRICT COURT
2007 AUG 10 PM 3:01
S.D. N.Y.

        Plaintiff Andrew Curry, by his attorneys Beranbaum Menken Ben-Asher &

Bierman LLP, alleges as follows:

        1.    This is an action arising under the Sec. 806 of the Sarbanes-Oxley Act of

2002, 18 U.S.C. 1514A.

        2.  Plaintiff Andrew Curry alleges that defendants terminated his employment and

otherwise retaliated against him because he engaged in activity protected under Sec. 806.

        4.  Plaintiff seeks declaratory and injunctive relief, including reinstatement to his

position and all lost benefits of his employment, and special damages as permitted under

Sec. 806.


                JURISDICTION AND EXHAUSTION OF
                    ADMINISTRATIVE REMEDIES

        5.  This action arises under Sec. 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.

Sec. 1514A.

        6.  Plaintiff has complied with all procedural requirements of Sec. 806 prior to

filing this complaint.

7.  Plaintiff timely filed a charge against defendants under Sec. 806 with the United States Department of Labor, Occupational Health and Safety Administration (Case No. 2 - 4173 - 06 - 058) on September 19, 2006, within 90 days after the date plaintiff was advised by defendants of the termination of his employment, in accordance with Sec. 806, 18 U.S.C. 1514A(b)(2)D).

8.  More than 180 days have passed since plaintiff filed his charge with the Department of Labor (DOL), and DOL has not issued a final decision within the meaning of 18 U.S.C. Sec. 1514A(b)(1)(B).

9.  On February 14, 2007, OSHA determined that there was not reasonable cause to conclude that defendants had violated Sec. 806.  Plaintiff's counsel received this determination on February 15, 2007.  OSHA did find that plaintiff had engaged in protected activity within the meaning of Sec. 806, that he had a reasonable belief that he was reporting fraud on VTG's shareholders, and that defendant VTG had known of his protected activity.

10.  On March 15, 2007, plaintiff filed timely objections to OSHA's decision, in accordance with the regulations of the Department of Labor, 29 CFR Part 1980.

11.  On May 9, 2007, as permitted by Sec. 806, plaintiff's counsel wrote the Department of Labor that plaintiff intended to file a complaint for de novo review in federal court, and requested that DOL terminate its proceedings concerning Mr. Curry's charge,

12.  This Court has jurisdiction over this action pursuant to 18 U.S.C. Sec. 1514A(b)(1)(B) and 28 U.S.C. 1331.

PARTIES AND VENUE

13.  Plaintiff Andrew Curry is a resident of the State of New York, residing at 7259 Shore Road, Brooklyn, N.Y. 11209.

14.  For eight years prior to his termination, Mr. Curry was the Director of the Management Services Group at defendant Volt Telecommunications Group, Inc.

15.  Defendant Volt Information Sciences, Inc. ("VIS") is a publicly traded corporation.  It has a class of shares registered under Sec.12 of the Securities Exchange Act of 1934, 15 U.S.C. 78l, and is required to file reports under Sec. 15(d) of the Securities and Exchange Act of 1934, 15 U.S.C. 78o(d).  It is incorporated in New York, and has its headquarters at 560 Lexington Avenue, New York, N.Y. 10022.  VIS is a Fortune 1000 company, with annual revenues exceeding $2 billion.

16.  Defendant Volt Telecommunications Group, Inc. ("VTG") is a wholly owned subsidiary of defendant Volt Information Sciences., Inc.  VTG has offices in Corona, California and at numerous other locations in the U.S. and internationally, including 560 Lexington Avenue, New York, N.Y. 10022.  It is incorporated in State of Delaware. VTG designs, engineers, constructs, installs and maintains voice, data and video infrastructures for both the private sector and government agencies.  VTG has over 1,000 employees, and provides services nationally and internationally.

17.  Venue is therefore proper in this District, pursuant to 28 U.S.C. 1391(b), in that defendants are residents of this District, and a substantial part of the events giving rise to plaintiff's claims occurred in this District.

18.  The value and performance of VIS is based, in part, on the value and performance of VTG; VTG and VIS share a common management and purpose; and VTG is also an agent of VIS.

-3-

FACTUAL ALLEGATIONS

19.  Plaintiff Andrew Curry has more than 35 years experience in the telecommunications industry.

20.  Before he was terminated by defendants, Mr. Curry had been continually employed since April, 1971.

21.  Mr. Curry was hired by defendants in March, 1998, as Volt's Director of Management Services.

22.  The Management Services group had five members, including Mr. Curry. The other members, all of whom reported to him, were Senior Quality Systems Managers Lisa Covell and Charles Calv, Quality Systems Manager Lisa Eckhart, and Licensing Manager Andrew Zelner.

23.  The Management Services group was responsible for implementing Volt Telecommunications Group's compliance with international and industry-wide standards called ISO 9001 and TL 9000.

**The international and industry-wide standards implemented by Mr. Curry's group**

24.  The ISO standards were developed by the International Organization for Standardization (ISO), which determines standards for businesses world wide.  ISO's standards range from mechanical ones (for example, how threads on various screw sizes are made) to business management standards (procedures for businesses to follow in management, accounting and financial transactions.)  See the ISO website, at www.iso.org, and more specifically the introductory material at http://www.iso.org/iso/en/aboutiso/introduction/index.html.  The ISO 9001 standard is

-4-

primarily concerned with "quality management," which concerns the customer's quality requirements, continuous improvement programs to ensure that those requirements are achieved, and applicable regulatory requirements. See http://www.iso.org/iso/en/iso9000-14000/understand/inbrief.html.

25. The TL 9000 standards are specific to the information technology and telecommunications industries. The TL 9000 standards define the requirements for the design, development, production, delivery, installation and maintenance of telecommunications products and services. They include procedures for contract administration, purchases of materials, and subcontractor services. They also provide a measurement system that allows companies to track performance and improve results. See http://tl9000.org/

26. The TL 9000 standard was developed by the QuEST Forum (the "Quality Excellence for Suppliers of Telecommunications Forum") The QuEST Forum is a group of the leading telecommunications and IT companies, including AT&T, Bell Canada, Deutsche Telecom, France Telecom, Verizon, 3M, Cisco Systems, Ericsson, Fujutsu, Hitachi, Motorola, NEC, Nokia, Siemens, and many others. It also includes major accrediting and standard-setting organizations from many countries. See http://www.questforum.org/membership/mm_dir.jsp. QuEST used the ISO 9001 standards as its foundation for the TL 9000 Quality Management System, and added requirements particular to the telecommunications and IT industries. Hundreds of companies adhere to these TL 9000 standards. Most major telecommunications and IT companies require both ISO 9001 and TL 9000 certifications as a requirement for their suppliers.

-5-

**Registration, certification and audit procedures
relevant to Mr. Curry's responsibilities**

27. Telecommunications companies that demonstrate compliance with the TL 9000 standard are investigated by an accredited "Registrar," which reviews the company's written procedures. If the Registrar approves the procedures, the company is considered "registered." In the next step, a QuEST certified auditor then visits the company and conducts an intensive Registration Audit to determine whether it is actually adhering to these written standards. If so, the company is confirmed by the Registrar to be in compliance with the TL 9000 standard, and is recommended to the QuEST Forum for formal certification as a TL 9000 company. See http://tl9000.org/tl_reg-press.htm. This certification process can take six to eighteen months. See http://tl9000.org/tl_faq-b.htm.

28. ISO 9001 certification is a pre-requisite for TL 9000 certification. The ISO 9001 certification process, which must precede the TL 9000 certification, can take from eighteen months to three years.

29. Once the company is certified, the ISO 9001 and TL 9000 standards require two types of ongoing audits. One is an annual "Surveillance Audit" by the TL 9000 registrar, to ensure that the company continues to comply with the standard. The company must also do regular internal audits of its ISO 9001 and TL 9000 compliance.

**Volt's registration, certification and audits**

30. Before Mr. Curry joined VTG, none of these procedures or approvals were in place at VTG. Volt had neither adopted the ISO 9001 standards, registered its procedures, or been certified after an audit as ISO 9001 compliant.

-6-

31. Mr. Curry's group was responsible for implementing these requirements, and ensuring that Volt continued to adhere to the ISO 9001 standards. Before Mr. Curry's employment, VTG's Central Office (CO) Division had advised its principal customer, AT&T, that it was completing ISO 9001 certification, although VTG had not initiated any action to obtain this certification.

32. Mr. Curry's group developed VTG's ISO 9001 Standard Operating Procedures, which were Volt's procedures for following the ISO 9001 standards, as well as the required Quality Policy and detailed Work Instructions documentation. These were submitted to the ISO 9001 registrar, which reviewed them, registered VTG, audited VTG's adherence to the Procedures, Quality Policy and Work Instructions, and then recommended VTG to the ISO for ISO 9001 certification.

33. Before submitting VTG's ISO 9001 Standard Operating Procedures for registration, Mr. Curry's group performed "Pre-Registration Audits" on Volt's procedures, to ensure VTG was complying with them. Once VTG was certified, it also performed internal audits on each internal organization and at each location, several times a year to evaluate compliance. This group also conducted weekly, semi-monthly and monthly Steering Committee meetings with each certified unit to direct the development of Continuous Improvement Programs. The same process was followed for the TL 9000 certification of VTG's Central Office division, its Verizon Corporate Telecommunications Services (VCTS) division, and its Contract Administration and Procurement Management division (CAPM).

34. Beginning in 2005, Mr. Curry's group audited four locations in Volt's Central Office, one in Volt's VCTS unit in Dallas, and Volt's CAPM division in Raleigh-Durham. There were at least two audits scheduled in 2005 for each location. Each audit

took several weeks, with a typical Pre-Registration audit lasting three to four weeks, and a post-certification internal audit lasting two weeks.   Audits were conducted both on-site and "virtually," but the form of the audit did not affect how long it took to complete. Mr. Curry had introduced "virtual" audits to reduce his group's travel expenses.

**Mr. Curry's protected activity under Sec. 806**

35.  Between February, 2005 and May, 2006, Mr. Curry engaged in activity protected by Sec. 806.

36.  Mr. Curry provided information, caused information to be provided and otherwise assisted in an investigation of conduct by defendants which Mr. Curry reasonably believed constituted a violation of the provisions listed and described in 18 U.S.C. 1514A(a)(1), including fraud on VIS's shareholders; in addition, by his investigation and complaints concerning such conduct, Mr. Curry participated or otherwise assisted in a proceeding about to be filed, within the meaning of 18 U.S.C. 1514A(a)(2).

37.  Mr. Curry's protected activity included the following:

**Mr. Curry's  2005 audits of CAPM**

38.  In March, 2004, the then President of Volt Telecommunications, William Braumlich, asked Mr. Curry's MS group to review VTG's financial performance.

39.  Mr. Curry's staff performed several analyses and recommended corrective actions to Mr. Braumlich and his Controller on February 28, 2005.   A copy of this report was forwarded to Assistant General Counsel Lisa Valentino in April, 2005, at her request.

40.  The Contract Administration and Procurement Management Division

-8-

(CAPM) requested ISO 9001 and TL 9000 certification in April, 2004. As part of this process, Mr. Curry's group produced audit reports of CAPM on April 8, 2005, June 29, 2005 and September 28, 2005, which found serious deficiencies in VTG's compliance with Volt's Sarbanes-Oxley ("SOX") procedures regarding contract administration, engagement of subcontractors and procurement of materials. Mr. Curry's reports specifically and extensively referred to Volt's SOX procedures.

41. VTG's CAPM Standard Operating Procedures (SOP's) for purchases of materials and for engagement of subcontractors specifically rely on VTG's Sarbanes-Oxley compliance procedures. VTG's internal controls for contracts and accounts payable, as required by Sec. 404 of SOX, were included in CAPM's ISO 9001 and TL 9000 Standard Operating Procedures.

42. Mr. Curry's audits found wide-ranging improprieties in the payments made to contractors and the purchases of materials.

43. These improprieties were material, in that the costs associated with them, as Mr. Curry repeatedly noted in his subsequent internal complaints, ran into the millions of dollars, a significant cost in a company which had not been profitable for several years.

44. In July, 2005, Mr. Braunlich was replaced as VTG's President by R. J. Anderson, who was Senior Vice President in VTG's Construction and Engineering Division. Most of Mr. Curry's audit findings concerned Mr. Anderson's division, and Mr. Anderson was hostile to Mr. Curry's auditing and compliance work on these issues. Over the next year, he worked to undermine Mr. Curry's authority, finally terminating him in June, 2006.

### Mr. Curry's complaint to Volt Information Science's CEO

45. On August 8, 2005, Mr. Curry wrote to Volt Information Science's CEO, William Shaw, discussing how his audits had found "deficiencies that could represent a [m]aterial [w]eakness in our internal financial controls" and noting that "fraudulent activity" might be involved."

46. Mr. Curry had several meetings with Volt's Vice President of Internal Accounting during the summer of 2005 to discuss his findings.

### Mr. Curry's provision of information to the New York State Attorney General

47. In November, 2005, Mr. Curry provided information to and met with the New York State Attorney General's office (Harold Wilson) concerning his group's audit findings. He provided the AG's office with copies of the audits, which found extensive improprieties in VTG's subcontracting and the purchase of materials. Mr. Curry also discussed allegations of payroll tax improprieties by Volt.

### Complaint to IRS regarding payroll tax fraud

48. On October 3, 2005, Mr. Curry filed a complaint of payroll tax fraud by Volt with the Internal Revenue Service, a federal law enforcement authority with the power to investigate fraud under Sec. 806. Mr. Curry met with the IRS on November 30, 2005. Mr. Curry also raised this complaint internally, by writing VIS President William Shaw, among others, that VTG was improperly using per diem payments to employees to significantly reduce payroll costs. Mr. Curry reasonably believed that the improper payments were material to VTG's and VIS's financial condition.

### Mr. Curry's complaint to Volt's General Counsel

49. On July 20, 2005, in memo titled "Request for Whistleblower [P]rotection,"

-10-

Mr. Curry wrote Volt Information Science's General Counsel, Howard Weinreich, referring to his group's audits finding "significant deficiencies in VTG's Sarbanes/Oxley management controls and serious variances with several corporate accounting / financial policies." He also said there were "strong indications of fraudulent activities related to purchases of materials and subcontractor services." He requested "protection from retaliation." He made a further request to Mr. Weinreich for whistleblower protection on August 9, 2005.

### Mr. Curry's internal complaint of retaliation

50. Mr. Curry made several complaints concerning Mr. Anderson's introduction of a new policy precluding telecommuting. He reasonably believed that this policy was being selectively enforced against his Management Systems group.

51. On October 28, 2005, Mr. Curry wrote General Counsel Howard Weinreich (with copies to CEO William Shaw and other executives), saying the policy change was retaliation for his group's raising of issues regarding "internal financial controls [and] illegal activities." He said that Volt's failure to "take appropriate corrective actions and hold senior managers accountable for ignoring internal financial controls...[and] illegal activities" represented "a serious disservice to our shareholders." He stated that he would be filing a charge under Sarbanes-Oxley with the Department of Labor.

52. Mr. Curry also prepared a list of VTG employees he had randomly checked, showing that the majority of these employees – whose one way commutes ranged from 4 to 48 miles – were permitted to telecommute, although Mr. Curry's employees' commutes were far lengthier.

53. On December 19, 2005, Mr. Curry wrote VIS CEO William Shaw and the independent members of the Board that he would be filing a complaint with DOL under

-11-

Sec. 806, based on the application of the new telecommuting policy. He stated that the telecommuting policy was in retaliation for the audits that had identified deficiencies in Volt's Sarbanes-Oxley compliance and payroll tax fraud which improperly reduced Volt's direct costs. He stated the Volt had failed to honor previous requests he had made for "whistleblower" status. Mr. Curry requested an independent investigation of all of these issues.

54. In May, 2006, Mr. Curry wrote VTG President R. J. Anderson, concerning the telecommuting policy, and again advising of his belief that VTG was violating requirements of the Sarbanes-Oxley Act.

55. Defendants were aware of plaintiff's protected activity under Sec. 806.

**Volt's retaliatory actions**

56. Following Mr. Curry's 2005 audits and the other protected activity in which he engaged through May, 2006, defendants took a series of retaliatory actions against Mr. Curry, in retaliation for his protected activity under Sec. 806, which culminated in his termination on June 23, 2006.

57. VTG's new CEO, R. J. Anderson, first proposed the elimination of Mr. Curry's Management Services Group, ostensibly as part of a company-wide cost reduction, in July, 2005, following Mr. Curry's submission of the April and June, 2005 audit findings.

58. Beginning in January, 2006, Mr. Anderson selectively enforced Volt's new policy against telecommuting, negatively impacting the members of Mr. Curry's Management Services group, and exempting employees in other groups whose commuting distances were far less.

-12-

59. Mr. Anderson directed Mr. Curry to reduce his Management Services budget by fifty per cent, which resulted in the transfer of two employees to other divisions (Senior Quality Systems Manager Charles Calv and Licensing Manager Andrew Zelner). This did not reduce operating expenses for VTG, since there was no change in these two employees' responsibilities or compensation.

60. Finally, on June 23, 2006, defendants, by Mr. Anderson, terminated Mr. Curry's employment, ostensibly as a cost-cutting measure.

61. Defendants' purported cost-cutting rationale for terminating Mr. Curry was a pretext for their actual motive, which was to retaliate against Mr. Curry for his repeated protected activity under Sec. 806.

62. Mr. Curry was the only member of his group who was fired. As described above, two others had been previously transferred to other divisions and retained their existing responsibilities, so Volt realized no savings concerning them. A fourth had resigned in May, 2006, before Mr. Curry was terminated (Senior Quality Systems Manager Lisa Covell). Volt left in place the group's least experienced and qualified member, Quality Systems Manager Lisa Eckhart, also saving no costs.

63. Defendants' termination of Mr. Curry, and the other actions described in paragraph 56 through 62 above, were in retaliation for Mr. Curry's protected activity under Sec. 806.

64. Defendant VIS was involved in, and approved of, the retaliatory actions taken against plaintiff by VTG.

65. Volt's financial results for its 2006 Fiscal Year showed that at the time the termination decision was made, VTG was profitable. For the nine months (first three quarters) ending July 31, 2006, VTG had a profit of $539,000.

-13-

66. Only two weeks before Mr. Curry was fired, VTG President Anderson sent an e-mail to all his direct reports, celebrating "another positive month" for VTG.

67. Thus, at the time Mr. Curry was fired, defendants had no legitimate fiscal reasons to terminate him.

68. Volt Information Sciences as a whole reported an increase in its net income for Fiscal Year 2006 over 2005, from $17 million to $30 million. In the third quarter, when Mr. Curry was fired, Volt Information Sciences had a profit of $8.4 million, compared to $5 million in the third quarter of 2005.

69. In addition, Mr. Curry had taken major steps to reduce even the bare-bones overhead of his group. The use of virtual, as opposed to on-site audits, was a significant cost-cutting measure, and the use of PC-based training materials further cut on-site travel costs. The telecommuting done by Mr. Curry's staff also saved VTG significant office overhead.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
Violation of Sec. 806 of the Sarbanes-Oxley Act.

70. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 69 above.

71. Defendants terminated plaintiff's employment and engaged in other discriminatory conduct which was in retaliation for lawful acts taken by plaintiff constituting protected activity under 18 U.S.C. 1514A(a).

72. By engaging in such retaliatory conduct, defendants violated Sec. 806 of the Sarbanes-Oxley Act, 18 U.S.C. 1514A.

WHEREFORE, Plaintiff requests that this Court enter an order:

1. Declaring that defendants violated Sec. 806 of the Sarbanes-Oxley Act;

2. Pursuant to 18 U.S.C. 1514A(c), awarding plaintiff all relief necessary to make plaintiff whole, including reinstatement to his position with seniority, back pay with interest, the value of all lost employment benefits, and front pay;

3. Pursuant to 18 U.S.C. 1514A(c), awarding plaintiff special damages, including litigation costs, expert witness fees, reasonable attorney's fees, and damages for injury to reputation and for emotional distress;

4. Granting such other and further relief as permitted by law.


### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury of this action.


Dated:  New York, N.Y.
        August 10, 2007


BERANBUAM MENKEN BEN-ASHER & BIERMAN LLP
Attorney for Plaintiff Andy Curry

By: _____

    JONATHAN BEN-ASHER  (JB-A  4572)
    KRISTEN FINLON (KF 2575)

80 Pine Street - 32nd floor
New York, N.Y. 10005
Telephone: (212) 509-1616
Facsimile:  (212) 509-8088


-15-

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANDREW CURRY,

                              Plaintiff,                    Civil Action No. 07 CV 7158 (DC)

        -against-

VOLT INFORMATION SCIENCES, INC. and
VOLT TELECOMMUNICATIONS GROUP, INC.,

                              Defendants.
-------------------------------------------------------------X

## DEFENDANTS' ANSWER TO THE COMPLAINT

        Defendants Volt Information Sciences, Inc. ("VIS") and Volt Telecommunications

Group, Inc. ("VTG") (collectively, the "Defendants"), by their attorneys, Troutman Sanders

LLP, for their answer to the Complaint of plaintiff Andrew Curry ("Plaintiff"), state as follows:

        1.      Deny the allegations contained in paragraph 1 of the Complaint, except admit

that Plaintiff purports to bring an action under the Sec. 806 of the Sarbanes-Oxley Act of 2002,

18 U.S.C. 1514A.

        2.      Deny the allegations contained in paragraph 2 of the Complaint, except admit

that Plaintiff purports to allege that Defendants terminated his employment and otherwise

retaliated against him because he purportedly engaged in activity protected under Sec. 806.

        3.      Deny the allegations contained in paragraph 4 of the Complaint, except admit

that Plaintiff purports to seek certain relief from Defendants.

        4.      Deny the allegations contained in paragraph 5 of the Complaint, except admit

that Plaintiff purports to bring an action under Section 806 of the Sarbanes-Oxley Act of 2002,

18 U.S.C. Section 1514(A).

5.     Deny the allegations contained in paragraph 6 of the Complaint.

6.     Deny the allegations contained in paragraph 7 of the Complaint, except admit that Plaintiff filed a charge against Defendants under Sec. 806 with the United States Department of Labor, Occupational Health and Safety Administration. (Case No. 2 - 4173 - 06 - 058) and respectfully refer the Court to the charge filed by Plaintiff with the Department of Labor, Occupational Safety and Health Administration, for the terms, contents and effect thereof.

7.     The allegations contained in paragraph 8 of the Complaint contain a legal conclusion to which no response is required and to the extent that any response is required, the allegations are denied.

8.     Deny the allegations contained in paragraph 9 of the Complaint, except admit that OSHA made a determination on February 14, 2007 and that in such determination, concluded that there was not reasonable cause to conclude that Defendants had violated Sec. 806, deny knowledge or information as to the date upon which Plaintiff received the OSHA determination and respectfully refer the Court to the OSHA determination, for the terms, contents and effect thereof.

9.     The allegations contained in paragraph 10 of the Complaint contain a legal conclusion to which no response is required and to the extent that any response is required, the allegations are denied and the Court is respectfully referred to the objections for the terms, contents and effect thereof.

10.     In response to paragraph 11 of the Complaint, admit that Plaintiff's counsel wrote the Department of Labor that Plaintiff intended to file a complaint for de novo review in federal court, and requested that DOL terminate its proceedings concerning Plaintiff's charges,

-2-

deny the remaining allegations contained in paragraph 11 of the Complaint and respectfully refer the Court to the letter sent by Plaintiff's counsel for the terms, contents and effect thereof.

11.    Deny the allegations of paragraph 12 of the Complaint.

12.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint.

13.    Deny the allegations of paragraph 14 of the Complaint, except admit that for eight years, Plaintiff was employed by VTG.

14.    Deny the allegations contained in paragraph 15 of the Complaint, except admit that VIS is a publicly traded corporation which has a class of shares registered under Sec.12 of the Securities Exchange Act of 1934, 15 U.S.C. 78l, is required to file reports under Sec. 15(d) of the Securities and Exchange Act of 1934, 15 U.S.C. 78o(d), is incorporated in New York, has its headquarters at 560 Lexington Avenue, New York, New York 10022, and is a Fortune 1000 company.

15.    Deny the allegations contained in paragraph 16 of the Complaint that VTG has numerous international offices and provides services internationally, and admit the remaining allegations of paragraph 16 of the Complaint.

16.    Deny the allegations contained in paragraph 17 of the Complaint, except admit that Plaintiff purports to base venue in this District based upon certain statutory provisions and that defendants are residents of this District.

17.    Deny the allegations of paragraph 18 of the Complaint.

18.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 of the Complaint.

19.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 of the Complaint.

20.    Deny the allegations of paragraph 21 of the Complaint, except admit that Plaintiff was hired in March 1998 and aver that Plaintiff's title was Director of Quality Control.

21.    Deny the allegations of paragraph 22 of the Complaint, except aver that Plaintiff worked with the Quality Management Systems Group.

22.    Deny the allegations contained in paragraph 23 of the Complaint and respectfully refer the Court to the ISO website and ISO standards of the International Standards Organization for the terms, contents and effect thereof.

23.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24 of the Complaint and respectfully refer the Court to the TL 9000 standards for the terms, contents and effect thereof.

24.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 of the Complaint and respectfully refer the Court to the TL 9000 standards for the terms, contents and effect thereof.

25.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 26 of the Complaint and respectfully refer the Court to the TL 9000 and ISO 9001 standards and the questforum website for the terms, contents and effect thereof.

26.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27 of the Complaint and respectfully refer the Court to the ISO 9001 standards, the TL 9000 standards and TL 9000 website for the terms, contents and effect thereof.

27.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 28 of the Complaint and respectfully refer the Court to the ISO 9001 standards, the TL 9000 standards and TL 9000 website for the terms, contents and effect thereof.

28.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 of the Complaint and respectfully refer the Court to the ISO 9001 standards and the TL 9000 standards for the terms, contents and effect thereof.

29.    Deny the allegations contained in paragraph 30 of the Complaint, except admit that before Plaintiff joined VTG, it had not registered its procedures, and had not been certified after an audit as ISO 9001 compliant.

30.    Deny the allegations contained in paragraph 31 of the Complaint.

31.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32 of the Complaint and respectfully refer the Court to the VTG ISO 9001 standards and the standards of the International Standards Organization for the terms, contents and effect thereof.

32.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33 of the Complaint and respectfully refer the Court to the VTG ISO 9001 standards.

33.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of the Complaint, except aver that in 2005, there were audits in four locations in VTG's Central Office, one in VTG's VCTS unit in Dallas, and VTG's CAPM division in Raleigh/Durham.

34.    Deny the allegations contained in paragraph 35 of the Complaint.

35.    Deny the allegations contained in paragraph 36 of the Complaint.

36.    Deny the allegations contained in paragraph 37 of the Complaint that the alleged activity was protected activity and deny the allegations of conduct engaged in as alleged in paragraph 37 of the Complaint.

37.    Deny the allegations contained in paragraph 38 of the Complaint that the alleged activity was protected activity and deny knowledge or information sufficient to form a belief as to the truth of the allegations of conduct engaged in as alleged in paragraph 38 of the Complaint.

38.    Deny the allegations contained in paragraph 39 of the Complaint that the alleged activity was protected activity and deny knowledge or information sufficient to form a belief as to the truth of the allegations of conduct engaged in as alleged in paragraph 39 of the Complaint, except admit that a copy of the report was forwarded to Assistant General Counsel Lisa Valentino in April, 2005 at her request, and respectfully refer the Court to the report for the terms, contents and effect thereof.

39.    Deny the allegations contained in paragraph 40 of the Complaint, except admit that audit reports of CAPM on April 8, 2005, June 29, 2005 and September 28, 2005 exist and respectfully refer the Court to the reports for the terms, contents and effect thereof.

40.    Deny the allegations contained in paragraph 41 of the Complaint and respectfully refer the Court to VTG's CAPM Operating Procedures, SOX and ISO 9001 and TL 9000 standards.

41.    Deny the allegations contained in paragraph 42 of the Complaint.

42.    Deny the allegations contained in paragraph 43 of the Complaint.

-6-

43.    Deny the allegations contained in paragraph 44 of the Complaint, except admit that in July 2005, Mr. R.J. Anderson became VTG's President and Mr. Anderson had been Senior Vice President in VTG's Construction and Engineering Division.

44.    Deny the allegations contained in paragraph 45 of the Complaint, except admit that on August 8, 2005, Plaintiff wrote to VIS' CEO, William Shaw, and respectfully refer the Court to the letter for the terms, context and meaning thereof.

45.    Deny the allegations contained in paragraph 46 of the Complaint, except admit that Plaintiff had meetings with VTG's Vice President of Internal Accounting in the summer of 2005.

46.    Deny the allegations contained in paragraph 47 of the Complaint, except deny knowledge or information as to the truth of the allegations that Plaintiff provided information to and met with the New York State Attorney General's office concerning his group's audit findings,  and provided the Attorney General's office with copies of the audits, and admit that Plaintiff engaged in discussions with VIS.

47.    Deny the allegations contained in paragraph 48 of the Complaint, except deny knowledge or information as to the truth of the allegations regarding Plaintiff's filing of a complaint of payroll tax fraud by Volt with the IRS, Plaintiff's meetings with the IRS, and admit that Plaintiff wrote to Mr. William Shaw, VIS' then President in October 2005 and respectfully refer the Court to that letter for its terms, contents and meaning.

48.    Deny the allegations contained in paragraph 49 of the Complaint, except admit that on July 20, 2005, Plaintiff wrote a memo to VIS' General Counsel, Howard Weinreich, referring to audits and made a request to Mr. Weinreich for whistleblower protection on

-7-

August 9, 2005, and respectfully refer the Court to the writing for its terms, context and meaning.

49.     Deny the allegations contained in paragraph 50 of the Complaint.

50.     Deny the allegations contained in paragraph 51 of the Complaint, except admit that on October 28, 2005, Plaintiff wrote VIS' General Counsel Howard Weinreich (with copies to CEO William Shaw and other executives), and respectfully refer the Court to the letter for its terms, context and meaning.

51.     Deny the allegations contained in paragraph 52 of the Complaint, except admit that Plaintiff made a list of employees that pertained to telecommuting.

52.     Deny the allegations contained in paragraph 53 of the Complaint, except admit that on December 19, 2005, Plaintiff wrote VIS CEO William Shaw and the independent members of the Board and respectfully refer the Court to the letter for its terms, context and meaning.

53.     Deny the allegations contained in paragraph 54 of the Complaint, except admit that in May 2006, Plaintiff wrote VTG President R. J. Anderson, and respectfully refer the Court to the letter for its terms, context and meaning.

54.     Deny the allegations contained in paragraph 55 of the Complaint.

55.     Deny the allegations contained in paragraph 56 of the Complaint.

56.     Deny the allegations contained in paragraph 57 of the Complaint.

57.     Deny the allegations contained in paragraph 58 of the Complaint.

58.     Deny the allegations contained in paragraph 59 of the Complaint.

59.     Deny the allegations contained in paragraph 60 of the Complaint, except admit that on June 23, 2006, Plaintiff's employment was terminated, and aver that Plaintiff's employment was terminated for legitimate, non-discriminatory business reasons.

60.     Deny the allegations contained in paragraph 61 of the Complaint, except admit that on June 23, 2006, Plaintiff's employment was terminated, and aver that Plaintiff's employment was terminated for legitimate, non-discriminatory business reasons.

61.     Deny the allegations contained in paragraph 62 of the Complaint.

62.     Deny the allegations contained in paragraph 63 of the Complaint.

63.     Deny the allegations contained in paragraph 64 of the Complaint.

64.     Deny the allegations contained in paragraph 65 of the Complaint, except admit that for the first three quarters of 2006, VTG had a profit of $539,000, but aver that for the fiscal year 2006, VTG incurred a net loss of $1,069,500.

65.     Deny the allegations contained in paragraph 66 of the Complaint, except that Mr. Anderson sent an e-mail and respectfully refer the Court to the e-mail for its terms, context and meaning.

66.     Deny the allegations contained in paragraph 67 of the Complaint.

67.     Admit the allegations contained in paragraph 68 of the Complaint, and aver that for the fiscal year 2006, VTG incurred a loss.

68.     Deny the allegations contained in paragraph 69 of the Complaint.

69.     In response to paragraph 70 of the Complaint, repeat and restate the responses to paragraphs 1 through 69 as through fully set forth herein.

70.     Deny the allegations contained in paragraph 71 of the Complaint.

71.     Deny the allegations contained in paragraph 72 of the Complaint.

The paragraphs immediately following Paragraph 72 of the Complaint state a prayer for relief to which no responsive pleading is required. To the extent a responsive pleading is required, Defendants deny Plaintiff is entitled to any relief whatsoever.

## JURY DEMAND

Defendants deny that Plaintiff is entitled to a jury trial.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof with respect to the matters asserted, Defendants plead the following defenses:

## FIRST AFFIRMATIVE DEFENSE

72.    Plaintiff's claims are barred for failure to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

73.    Plaintiff's employment was terminated for legitimate, non-discriminatory business reasons.

## THIRD AFFIRMATIVE DEFENSE

74.    Plaintiff's claims are barred, in whole or in part, by his failure to make reasonable efforts to mitigate his alleged damages.

## FOURTH AFFIRMATIVE DEFENSE

75.    Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, estoppel and/or laches.

## FIFTH AFFIRMATIVE DEFENSE

76.    Plaintiff's claims are barred, in whole or in part, by the doctrine of election of remedies.

## SIXTH AFFIRMATIVE DEFENSE

77.     Plaintiff's claims are barred, in whole or in part, to the extent that he failed to properly and timely satisfy and/or exhaust all necessary administrative, statutory and/or jurisdictional prerequisites for the commencement of this action.

## SEVENTH AFFIRMATIVE DEFENSE

78.     Plaintiff's claims are barred, in whole or in part, by the applicable statute(s) of limitations.

## EIGHTH AFFIRMATIVE DEFENSE

79.     Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to participate in any protected activity or to otherwise satisfy the elements of a whistle-blower claim under the Sarbanes-Oxley Act of 2002.

## NINTH AFFIRMATIVE DEFENSE

80.     With respect to VIS, Plaintiff's claims are barred, in whole or in part, because VIS was not Plaintiff's "Employer"; nor was Plaintiff VIS' "employee" under applicable law.

## TENTH AFFIRMATIVE DEFENSE

81.     Plaintiff's claims are barred, in whole or in party, by unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

82.     Plaintiff has received all compensation and benefits to which he was entitled.

## TWELFTH AFFIRMATIVE DEFENSE

83.     Defendants at all times followed stated, nondiscriminatory policies.

## THIRTEENTH AFFIRMATIVE DEFENSE

84.     To the extent that Plaintiff seeks to assert claims for reputational, physical or emotional injuries or other non-pecuniary remedies, Plaintiff is not entitled to such remedies

under the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A, and such remedies are also barred, in whole or in part, by the exclusive remedies provision of the New York Worker's Compensation Law.

### FOURTEENTH AFFIRMATIVE DEFENSE

85.     Plaintiff was an employee at will whose employment could be terminated at any time and for any nondiscriminatory reason.

### FIFTEENTH AFFIRMATIVE DEFENSE

86.     To the extent that Defendants had notice of alleged retaliation, Defendants took prompt and appropriate remedial action.

### SIXTEENTH AFFIRMATIVE DEFENSE

87.     Plaintiff is barred from pursuing his claims in this forum because the claims advanced in the Complaint are the subject of an arbitration agreement.

WHEREFORE, defendants Volt Information Sciences, Inc., and Volt Telecommunications Group, Inc. demand judgment dismissing the Complaint, and each claim contained therein, awarding defendants' their costs and disbursements, attorneys' fees and expenses and granting such other and further relief as may be just and proper.

Dated: New York, New York
       October 2, 2007

TROUTMAN SANDERS LLP

By: _____

Sharon H. Stern (SHS-3788)
Attorneys for Defendants
Volt Information Sciences, Inc., and
Volt Telecommunications Group, Inc.
The Chrysler Building
405 Lexington Avenue
New York, New York  10174
(212) 704-6068

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANDREW CURRY,

                                  Plaintiff,                    Civil Action No. 07 CV 7158 (DC)

          -against-                                            **AFFIDAVIT OF SERVICE**

VOLT INFORMATION SCIENCES, INC. and
VOLT TELECOMMUNICATIONS GROUP, INC.,

                                  Defendants.
-----------------------------------------------------------------X

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

          I, **WENDY ISBISTER,** being duly sworn, state:

          I am not a party to the action; am over eighteen (18) years of age; and reside in

Pawling, New York.

          On **October 2, 2007**, I served a copy of **Defendants' Answer to the Complaint,**

by depositing a true copy of the same, enclosed in wrapper, via overnight mail under the exclusive

care and custody of FedEx, addressed to the following at the last know addresses set forth below:

To:    Jonathan Ben-Asher, Esq.
       Beranbaum Menken Ben-Asher & Bierman LLP
       80 Pine Street, 32nd Floor
       New York, New York 10005

                                                    Wendy L. Isbister

Sworn to before me this
2nd day of October, 2007

Notary Public

LUCILLE ORTIZ
NOTARY PUBLIC, State of New York
No. 01OR4722675
Qualified in Nassau County
Commission Expires Feb. 28, 2011

# EXHIBIT C



**ALL ABOUT VOLT**

**V O L T**

**IN - HOUSE EMPLOYEE HANDBOOK**

*Volt Telecommunications Group, Inc.*

# ACKNOWLEDGMENT

I, _____ (Print Name), have received my copy of the employee handbook of Volt Telecommunications Group, Inc., a wholly owned subsidiary of Volt Information Sciences, Inc. I understand that this handbook is intended to provide me with information about the Company's general policies and is not a contract of employment. I understand that both the Company and I have the right to terminate my employment with or without notice and with or without cause at any time and that no Company officer except the President and/or Executive Vice President of Volt Information Sciences, Inc. has any authority to enter into any agreements for employment or to make any agreement contrary to the foregoing and any such agreement must be a written and signed agreement.

I will read and follow the policies described in the handbook. I understand that violation of any of the Company's written or unwritten rules, personnel policies or practices may result in my immediate discharge. I understand that the Company has the right to change, interpret, or cancel any of its published or unpublished personnel policies, benefits or practices without advance notice. Because the Company's policies may change from time to time, I have been instructed to check with my supervisor if I have a specific question about any Company policy or practice.

I have read, understand, and agree to be bound by the Company's Discrimination Complaint Procedures, including Arbitration, and expressly waive my right to sue the Company, its agents and employees, in court and I agree to submit to final and binding arbitration any dispute, claim or controversy arising between me and the Company that I would have been otherwise entitled to file in court.

Date _____

Printed Name _____

Signature of Employee _____

_____

(12/14/2001)                                                                    1

2

# TABLE OF CONTENTS

**I.   WHAT YOU SHOULD KNOW**

Foreword and Your Company Handbook ....... 7

Welcome ....... 9

This is Volt ....... 10

Our Philosophy ....... 11

Mission Statement ....... 12

Your Responsibilities As An Employee ....... 12

Your Supervisor ....... 12

Orientation Session ....... 12

Equal Employment Opportunity and
Workplace Harmony ....... 13

Drug Free Workplace Policy ....... 13

Harassment Policy ....... 14

Sexual Harassment Policy Statement ....... 16

Keep Us Informed ....... 18

Telephone Etiquette and Use ....... 18

Attendance ....... 18

Employment of Relatives ....... 19

Employment Eligibility Verification ....... 19

Concerns and Issues Procedure ....... 20

Discrimination Complaint Procedures ....... 20

Alternative Dispute Resolution ....... 20

Personnel Records and Privacy ....... 21

Corrective Action ....... 21

Performance Appraisals ....... 22

Employee Classifications ....... 23

3

II.  YOUR BENEFITS ..................................................................... 25

Health and Dental Insurance .................................................. 25

Modified Health Contribution Plan ........................................ 25

COBRA Rights ......................................................................... 26

Basic Life and Supplemental Life Insurance .......................... 26

Accidental Death and Dismemberment Insurance ................. 26

Workers' Compensation Insurance ......................................... 27

Business Travel Insurance ...................................................... 27

Long Term Disability Insurance ............................................. 27

Personal/Sick Time ................................................................. 28

Salary Continuation Program ................................................. 28

Holidays .................................................................................. 29

401(k) Savings Plan ................................................................ 29

Dependent Care Flexible Spending Account .......................... 30

Vacation .................................................................................. 31

Condolence Days ..................................................................... 32

Employee Referral Program .................................................... 32

Reinstatement of Benefits (Bridging) ..................................... 32

III.  LEAVES OF ABSENCE .......................................................... 33

Military Leave ......................................................................... 33

Family Medical Leave (FMLA) .............................................. 33

Pregnancy Disability Leave .................................................... 33

Workers' Compensation Leave ............................................... 33

Jury Duty Leave ...................................................................... 33

IV.  YOUR PAY ............................................................................. 35

Timekeeping ............................................................................ 35

Payday ..................................................................................... 35

Payroll Deductions .................................................................. 35

Overtime .................................................................................. 36

V.  WORK ENVIRONMENT .......................................................... 37

Hours of Work ......................................................................... 37

Safety ...................................................................................... 37

Personal and Plant Security .................................................... 37

Electronic Communication Policy .......................................... 38

Smoking ................................................................................... 42

Solicitation and Distribution Policy ....................................... 42

Taping/Eavesdropping on Conversations ............................... 43

VOLT Newsletter .................................................................... 43

Exit Interviews ........................................................................ 44

VI.  STANDARDS OF CONDUCT .................................................. 45

VII.  GLOSSARY OF TERMS ........................................................ 47

# I. WHAT YOU SHOULD KNOW

*FOREWORD*

This employee handbook has been prepared to help you start your career with Volt Information Sciences, Inc. and its subsidiaries collectively referred to in this handbook as "Volt" or "the Company". It will familiarize you with the various employee benefits, programs, responsibilities, policies and procedures. Questions regarding information contained in this manual should be directed to your immediate supervisor or the Human Resources Department. In the event that there are policies and practices that you do not find in the manual and about which you have questions, please ask your supervisor for the information.

*YOUR COMPANY HANDBOOK*

The information contained in this employee handbook has been prepared as a general guide regarding Volt Information Sciences', Inc. policies, practices and procedures and is not all inclusive. Different divisions may have different policies. The policy that applies to your division applies to you. With publication of this handbook, all previous policies, benefits, practices and procedures relating to the matters contained herein are rescinded and replaced by this publication. However, the policies, benefits, practices and procedures contained in this book, and those that may be issued from time to time, are not a contract of any kind. Although they reflect current policy, they may be changed or rescinded at any time without prior notice at the Company's discretion. In some cases, the changes may be made by management and, in some cases, changes will be made by the Volt Information Sciences' Board of Directors.

Your employment relationship with Volt is **at-will**. Employment at-will reserves the Company's right and your right to terminate your employment at any time for any reason, with or without cause. No oral statement by an Officer, manager or supervisor will modify the at-will relationship. Only the President and Executive Vice President of Volt Information Sciences, Inc. are authorized to modify the at-will relationship and only in a written and signed agreement.

The enclosed information may differ according to the law of the state in which you work in which case Volt will comply with those laws. Whenever federal and state laws differ, the provisions of the appropriate law will apply. In general, applicable provisions are the ones most favorable to the employee.

8

To employees covered by a Collective Bargaining Agreement some of the policies contained in this Employee Handbook may not apply to you such as, but not limited to, Personal/Sick Time Leave, Vacation, Corrective Action, Alternative Dispute Resolution, Health and Dental Insurance and 401(k) Savings Plan. Please contact your manager if you have any questions.

Please take the time to read this brochure and save it for future reference.

(12/14/2001)

---

# WELCOME

Dear Volt Employee:

We are pleased to have you as a member of the Volt staff. You have joined a dynamic organization that has earned a worldwide reputation for quality services. This reputation has been earned through the efforts of our employees. At Volt, we believe that the attainment of Company objectives is determined in large part by the realization of the personal goals of each employee. Accordingly, we hope to offer you many challenging opportunities for personal as well as professional satisfaction.

This handbook has been designed to acquaint you with Volt — who we are, what we do and what we expect from you on the job. It includes information on Volt's policies along with a look at our history.

Of course, it is impossible for us to anticipate all of your questions in this handbook. Your manager will be pleased to answer any additional questions that you may have about Volt, its policies and your particular responsibilities.

The management of Volt, as well as all of your fellow employees, join us in wishing you success in your job. We hope that your career at Volt will be rewarding.

William Shaw
President

Jerome Shaw
Executive Vice President

(12/14/2001)

9

## THIS IS VOLT

It was over fifty years ago that two brothers, William and Jerome Shaw, moved Volt's first office from their mother's kitchen table to larger quarters on the sixth floor of 34 Park Row in New York City. Today, William Shaw is President and Jerome Shaw is Executive Vice President of Volt Information Sciences, Inc., an international company with headquarters in New York City and Orange, California. With revenues over a billion dollars, the Company today counts many of the largest companies in the country as its customers and joint venture partners. While developing the Company's products and services, the following subsidiaries and divisions were created and each had some noteworthy accomplishments as they grew and prospered.

- **VOLT SERVICES GROUP** markets a full spectrum of domestic and international Staffing solutions such as managed services, temporary personnel and professional placement services through its **Volt Services Group**, **Volt Human Resources** and **Volt Europe** divisions from approximately 350 offices and on-site locations throughout the United States, Puerto Rico, Canada and Europe. Volt offers turnkey temporary personnel in various technical, information technology (IT) professional, commercial, light industrial, electronic assembly and financial classifications to a wide range of industries, as well as government agencies and universities. In addition, professional employer organization (PEO) services are offered by the Company's subsidiary, **Shaw & Shaw**.

- **VOLT DELTA RESOURCES** developed one of the first computerized directory assistance (411) systems in the country. Today, it continues to develop new technology in directory assistance for its customers, which include some of the largest telecommunications companies nationally and internationally. **Volt Delta Europe, Ltd.** is dedicated to delivering innovative, flexible and profitable Operator and Agent Services solutions to the rapidly changing European, telecommunications market. **Maintech**, a subsidiary of Volt Delta, has over 25 years experience in maintaining and installing DEC systems and UNIX workstations for users in multi-vendor, multi-site, large account environments. Today, **Maintech** supports the complete DEC, Sun, IBM RS/6000, HP Workstation and Silicon Graphics product lines as well as most PC and peripheral products. Also, **Maintech** is an independent provider of desktop support services.

- **VOLT DIRECTORY SYSTEMS/SERVICES DIVISION** was the first to convert much of the former Bell System's white and yellow pages directories from "hot lead" to computerized "cold type". Volt continues to be a leader in electronic yellow and white page systems internationally.

- **DATA NATIONAL**, has provided business owners affordable Yellow Pages Advertising Programs and consumers an easy-to-use source for finding products and services since 1971. DataNational publishes and delivers 124 titles with a combined circulation of over 9.32 million copies.

- **VOLT DIRECTORY MARKETING, LTD.** specializes in telephone sales support for the directory industry as well as specialty directory publishing.

- **VOLT VIEWTECH** develops software and enhanced information systems, which are used by customer service representatives in the nation's leading utilities. VIEWtech also administers utility rebate and financing programs that promote greater energy and water efficiency.

- **VOLT TELECOMMUNICATIONS GROUP, INC.**, is a nationwide, full service provider of turnkey solutions to the telecommunications, cable, wireless and many other industries. Volt Telecommunications Group provides end-to-end project-service work with its own employees. It provides these services through five separate business units— Outside Plant Engineering, OSP Construction, Central Office (Engineering, Furnishing, and Installing), Wireless and Business Systems Integration. In this latter unit, it provides inside wiring and cabling and field installation and repair. Volt Telecommunications Group is the sole-source provider to a number of Fortune 500 companies.

## OUR PHILOSOPHY

Volt believes in a work environment which fosters innovation and involvement to meet our unique business challenges. At Volt, the most powerful resource available to us is our people. It's your knowledge and expertise that enables us to compete successfully in our marketplace. We firmly believe in providing quality service to our customers and a quality workplace for our employees. Through this commitment, we will continue to ensure our success and growth as a corporation.

As you can see, Volt has come a long way since William and Jerome Shaw planned their future at their mother's kitchen table. As both of them always say, "You have to start with a dream to make a dream come true."

10

(12/14/2001)

(12/14/2001)

11

## MISSION STATEMENT

Volt Telecom Group created the Mission Statement to show our desire to grow and become "The Nationwide Full Service Provider" of turnkey services across multiple business units. The Mission Statement is:

> *Be the marketplace leader in providing high quality, single-source telecommunications and infrastructure services, solutions and support.*

## YOUR RESPONSIBILITIES AS AN EMPLOYEE

Throughout your handbook you'll find information on your responsibilities and Volt's programs, guidelines, benefits, and services. The employee responsibilities covered here are general, basic guidelines.

At Volt, service to customers is everyone's responsibility. Your goal is to treat your customers with respect as well as your fellow co-workers. You're expected to act in ways reflecting favorably on Volt and yourself, and to avoid any activities interfering with our operations or with other employees.

You should maintain a neat businesslike appearance appropriate to your job.

## YOUR SUPERVISOR

Part of your supervisor's responsibilities is to see that you are informed, and to help you succeed in your job. Your supervisor is available to answer your questions, discuss problems, and will assist you in every way that is reasonable and possible.

## ORIENTATION SESSION

To help you become acquainted with the Company, an orientation session at the time you begin employment will be conducted to discuss general policies, the scope of the organization and provide an opportunity to learn and ask questions about Volt. Usually, this orientation will be conducted by your supervisor and/or Human Resources or your Branch Manager.

## EQUAL EMPLOYMENT OPPORTUNITY WORKPLACE AND HARMONY

Volt is very aware of the richly diverse population from which it draws its employees throughout the United States and the World.

In fact, we now operate on four continents, either with American, foreign national employees and/or foreign partners. Volt believes that we are greatly enriched by such diversity at home and abroad, and we encourage all of our employees everywhere to seek to learn more about each other and our cultural differences, rather than to ignore or reject them because we do not understand them. The World, indeed, is smaller and our daily contacts in the new millennium are likely to be considerably different than they were in the past. Working together now to work in cultural harmony prepares us as a Company, of which all of us at Volt are a part, to compete now and in the future. No matter how you look at it, we are all in this together.

In order to promote this harmony in the workplace as well as to obey the laws related to employment, Volt remains committed to its policies of equal employment.

Volt is committed to a policy of equal treatment and opportunity without regard to race, color, creed, religion, sex, sexual preference, marital or parental status, national origin, age, veteran status; individuals with disabilities or other protected classification. This includes, but is not limited to, recruitment, hiring, selection for training, transfers or layoff, promotion, rates of pay and other forms of compensation and participation in Volt sponsored educational, social and recreational programs.

Administration of this policy is the responsibility of Volt's regional, branch and unit managers, and implementation is the obligation of every executive, manager and supervisor. But in the final analysis, attainment of our goal of equal employment opportunity and enrichment through diversity depends on the commitment and good faith effort of all of us.

## DRUG FREE WORKPLACE POLICY

Volt Information Sciences, Inc. is committed to providing a safe, healthful and efficient work environment for its employees. The Company recognizes that the misuse of drugs and alcohol can adversely affect both the environment, the job performance as well as the quality of work performed by the employee. For these reasons, the sale, purchase, distribution, use or possession, of unauthorized drugs or controlled substances, using or being under the influence of alcohol while on duty, whether on Company premises or not, including parking areas is strictly prohibited.

14

The Company reserves the right to conduct random drug tests on employees who are not subject to the Department of Transportation's (DOT) or Department of Defense's (DOD) substance abuse testing regulations but either have access to classified information or they are in positions involving the health or safety of themselves or others or whose positions involve a high degree of trust and confidence. Drug testing for employees subject to DOT and DOD substance abuse testing regulations shall be governed by those regulations. In all other cases the decision to implement drug testing will be at the company's sole discretion. The Company further reserves the right to test any employee based on reasonable suspicion that the employee may be drug-involved; following workplace accidents or unsafe practices; or as a follow-up procedure where the employee previously has tested positive or has completed a drug rehabilitation or counseling program.

As a condition of employment, employees must abide by the terms of this policy. Any employee found to be in violation of the Drug Free Workplace Policy will be subject to disciplinary action up to and including discharge. Please read and sign the form titled: Policy Regarding Illegal Drug Abuse (Form: VTC 253) contained in your new hire package.

Any employee in need of assistance due to drug use can get confidential counseling and referral from the following outside sources:

Substance Abuse Center
1-800-662-HELP

Focus & Recovery Helpline
1-800-234-0420

Alcohol & Drug Treatment Center
1-800-647-0042

## HARASSMENT POLICY

Volt is committed to a workplace free of discrimination and harassment based on race, color, religion, age, sex, national origin, sexual orientation, disability, status as a veteran, or any other protected status. Offensive or harassing behavior will not be tolerated against any employee. This policy covers vendors, customers, or others who enter our workplace, as well as all employees. Supervisory or managerial

personnel are responsible for taking proper action to end such behavior in their workplace. No employee of this company is exempt from this policy.

Offensive conduct or harassment of a sexual nature, or based on race, color, religion, age, sex, national origin, disability, status as a veteran or any protected status is prohibited. This may include but is not limited to:

• Comments which are not flattering regarding a person's nationality, origin, race, color, religion, gender, sexual orientation, age, body disability, or appearance.

• Distribution, display or discussion of any written or graphic material that ridicules, denigrates, insults, belittles, or shows hostility or aversion toward an individual or group because of national origin, race color, religion, age, gender, sexual orientation, pregnancy, appearance disability, marital or other protected status.

• Offensive physical actions, written or spoken, and graphic communication (for example, obscene hand or finger gestures or sexually explicit drawings).

• Any type of physical contact when the action is unwelcomed by recipient (for example, brushing up against someone in an offensive manner).

• Slurs, jokes, negative stereotyping, posters, cartoons, and gestures that are offensive.

• Expectations, requests, demands or pressure for sexual favors.

Any such offensive conduct will be considered a prohibited form of harassment when any of the following are true:

• There is a promise or implied promise of preferential treatment or negative consequence regarding employment decisions or status.

• Such conduct has the effect of creating an intimidating or hostile or offensive work environment, or unreasonably interferes with a person's work performance.

A third party is offended by the sexual conduct or communication of others.

Harassment is considered a form of employee misconduct. Disciplinary action, up to and including termination, will be taken against any employee engaging in this type of behavior. Any supervisor or manager who has knowledge of such behavior yet takes no action to end it is also subject to disciplinary action. Anyone who believes he or she is being discriminated against as a result of harassing behavior is encouraged to report it.

It is the policy of Volt that no one will be retaliated against for making a complaint of harassment or for cooperating in the investigation of a complaint.

An employee who feels harassed, discriminated or retaliated against may initiate the complaint process by contacting your supervisor, or, if appropriate, the next level of management. You may at any time contact your divisional Human Resource Department or you may contact the Corporate Vice President of Human Resources in New York at 212-.704-2423. All harassment charges will be promptly investigated and will be treated confidentially to the extent possible and appropriate action taken where warranted. Complaints made in good faith will in no way be held against an employee.

## SEXUAL HARASSMENT POLICY STATEMENT

Volt is committed to providing a work environment that is free from sexual harassment.

The Equal Employment Opportunity Commission established guidelines setting forth the following criteria by which to determine the unlawfulness of sexual harassment.

Sexual harassment would be considered to exist if:

1. Submission to some "conduct of a sexual nature" is either an explicit or implicit term or condition of employment; and/or

2. The harassment has the effect of substantially interfering with the individual's work performance or creating an intimidating, hostile, or offensive work environment, and/or

Submission or rejection of such "conduct" serves as the basis for an employment decision.

While it is not possible to list all those additional circumstances that may constitute sexual harassment, the following are some examples of conduct which if unwelcome, may constitute sexual harassment depending upon the totality of the circumstances including the severity of the conduct and its pervasiveness:

Unwelcome sexual advances - whether they involve physical touching or not;

Sexual epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life; comment on an individual's body, comment about an individual's sexual activity, deficiencies, or prowess;

Offensive e-mail or voice-mail messages;

Displaying sexually suggestive objects, pictures, cartoons;

Unwelcome leering, whistling, brushing against the body, sexual gestures,

suggestive or insulting comments;

Inquiries into one's sexual experiences;

Discussion of one's sexual activities; and,

Any other conduct or behavior deemed inappropriate by Volt.

Sexual harassment has no place in the ordinary course of business and is, in fact, unlawful. Specifically, it must in no way be exercised for purposes of an intimidating effect on employment decisions such as promotion, termination, hiring, training, wage and salary increases, transfer, or any other matter that affects the ability of an employee to perform job duties.

It is the policy of Volt Information Sciences, Inc. that such sex-related intimidation at any work place constitutes sex discrimination and is hereby prohibited under our long-standing policies against discrimination based on sex.

Managers and supervisors are to insure that no such intimidation or harmful atmosphere of unwelcome sexual overtones exists in their workplaces. Every effort should be made to sensitize themselves and their employees to the differences between purely social overtones and those intended to affect working conditions. Also, employees are responsible for respecting the rights of their co-workers.

Further, any retaliation against an individual who has complained about sexual harassment or retaliation against individuals for cooperating with an investigation of a sexual harassment complaint is similarly unlawful and will not be tolerated.

It is the right of any employee to make a complaint through any complaint procedure within the Company and its subsidiaries and divisions. You are, in fact, encouraged to discuss with management any charges of sexual harassment. Please contact your supervisor immediately or, if appropriate, the next level of management. You may at any time contact your divisional Human Resources Department or you may contact the Corporate Vice President of Human Resources in New York at 212-704-2423. All harassment charges will be promptly investigated and will be treated confidentially to the extent possible and appropriate action taken where warranted. We hope, however, that such complaints can be avoided by each Volt employee respecting the dignity and personal wishes of each employee and by exhibiting the highest standards of social business behavior at all time.

Using Volt's complaint procedures does not prohibit you from filing a complaint with your local, state or federal agency responsible for investigating sexual harassment. Please see the bulletin board in your office where the addresses and phone numbers for these agencies are posted. Please note that there may be a time limit during which a claim may be filed.

If it is determined that inappropriate conduct has been committed by one of our employees, we will take action as is appropriate under the circumstances. Such action may range from counseling to termination of employment, and may include such other forms of disciplinary action, as we deem appropriate under the circumstances.

## KEEP US INFORMED

Inform the Human Resources Department or your Branch Manager as soon as possible when there is a change in your name, address, telephone number, person to be notified in case of emergency, tax exemptions, educational degrees, diplomas or any other change that should be entered on your personnel record.

Employees covered by the Health and Life Plans must report the following changes to the Benefits Department: marriage, divorce, legal separation, insurance beneficiaries, newborn, adoption, or a child who stops being a dependent as defined by the Plans. Failure to report such changes within 30 days of the change may result in a loss of benefits.

## TELEPHONE ETIQUETTE AND USE

Telephone techniques are extremely important in business today. A friendly but businesslike telephone manner should always be projected. It is important to identify yourself and your department so the caller is certain they have the correct extension. Your fellow employees and our customers will always appreciate the courtesy you show.

Because the telephone plays a very important role in our business, it is essential that personal calls be kept to a minimum and, even when absolutely necessary, be as brief as possible.

## ATTENDANCE

You're part of a team, and getting the work done depends on everyone being in the right place at the right time. As an employee, you should be conscientious about your attendance and punctuality at work. Attendance is also an important measure of your overall performance on the job.

To avoid conflict with the operations of the department, employees should schedule personal affairs outside of regular working hours.

Each employee is required to call his/her supervisor within one hour prior to his/ her scheduled starting time if he/she expects to be absent from work. Please contact your supervisor each day you are absent from work. Your supervisor may request a physician's statement. The Company reserves the right to request that you be examined by a doctor of the Company's choice. Employees failing to notify their supervisor at all may be subject to disciplinary action, up to and including discharge.

18                                                    (12/14/2001)

---

Failure to call in for three consecutive days will be considered a voluntary resignation unless a medical excuse is provided by a physician.

Employees are expected to be at their places of work ready to start at the scheduled time. Should arrival at work be unduly delayed, employees must notify their supervisor within one hour of their scheduled starting time. Excessive absences, lateness or failure to give your supervisor advance notice for absence or lateness can result in disciplinary action or dismissal.

## EMPLOYMENT OF RELATIVES

Relatives of present employees may be hired only if (1) the individuals concerned will not work in a direct supervisory relationship, and (2) the employment will not pose difficulties for supervision, security, safety, or morale. "Relatives" are defined as spouses, children, sisters, brothers, mother, or father, and persons related by marriage. Present employees who marry, or who become related by marriage, will be permitted to continue employment with Volt only if they do not work in a direct supervisory relationship with one another, or otherwise pose difficulties for supervision, security, safety, or morale. If employees who marry, or who become related by marriage, do work in a direct supervisory relationship with one another, Volt will attempt to reassign one of the employees to another position, for which he or she is qualified, if such a position is available. If no such position is available within 30 days after the relationship arises, then one of the employees will be required to leave Volt. The decision as to which employee will leave is left solely to the employees involved and must be given to the Human Resources Department within 45 days after the relationship arises.

## EMPLOYMENT ELIGIBILITY VERIFICATION

In compliance with the Immigration Reform and Control Act of 1986, Volt only hires persons who are citizens, persons lawfully admitted to the United States for permanent residence, or aliens authorized by the Attorney General or the Immigration Act to work in the United States.

All newly hired employees must provide proof of work eligibility and identification within 3 days of hire. If the employee is unable to produce the required documentation or a receipt/letter requesting appropriate documentation within three days, the employee will be terminated. If, after 90 days of hire, the employee has not submitted the original documents to replace the receipt/letter or, in the meantime, some other acceptable document(s), the employee will be terminated.

(12/14/2001)                                                    19

## CONCERNS AND ISSUES PROCEDURE

You are encouraged to discuss your work-related concerns and/or issues with management. Arrange a meeting with your immediate supervisor to resolve any concerns or issues you may have. If you believe that it would not be appropriate to raise the subject matter with your immediate supervisor or the subject matter remains unresolved, please submit a written statement to your Division Head. Your Division Head or a designee may meet with the supervisor and employee for the purpose of resolving your issues. You may at any time contact the Human Resources Department.

If your concerns involve discriminatory practices, contact your Human Resources Department immediately. Charges will be promptly investigated and will be treated confidentially to the extent possible. Appropriate action will be taken where warranted. Refer to Discrimination Complaint Procedures for other sources, internal and external to whom you may make a complaint.

Retaliation against any employee making such a complaint is strictly prohibited.

## DISCRIMINATION COMPLAINT PROCEDURES

If you believe you have been discriminated against on the basis of age, race, color, religion, sex, national origin, physical or mental disability, marital status, sexual affectional preference, sexual harassment, pregnancy, citizenship, or veteran status, notify your supervisor immediately. Your supervisor will make every effort to resolve the issue. If your complaint is against your supervisor, make your complaint to his/her supervisor. At any time, you may contact your Human Resources Department. Should you wish, you may also contact the Corporate Vice President of Human Resources in New York at (212) 704-2423. Charges will be promptly investigated and will be treated confidentially to the extent possible and appropriate action taken where warranted.

Retaliation against any employee making such a complaint is strictly prohibited.

## ALTERNATIVE DISPUTE RESOLUTION

Volt believes that alternative dispute resolution is the most efficient and mutually satisfactory means of resolving disputes between Volt and its employees. Any dispute, controversy or claim which was not settled through the Concerns and Issues Procedure and arises out of, involves, affects or relates in any way to any

employee's employment or a claimed breach of that employment relationship or the conditions of your employment or the termination of employment, including but not limited to disputes, controversies or claims arising out of or related to the actions of Volt's other employees, under Federal, State and/or local laws shall be resolved by final and binding arbitration. The applicable rules of the American Arbitration Association in the state where employee is or was last employed by Volt shall prevail.

The arbitrator shall be entitled to award reasonable attorneys' fees and costs to the prevailing party. The award shall be in writing, signed by the arbitrator, and shall provide the reasons for the award. The Arbitrator may provide for any remedies that would be available in a comparable judicial proceeding, unless such remedies are precluded under state law. This does not prevent you from filing a charge or claim with any governmental administrative agency as permitted by applicable law.

Arbitration is an essential element of your employment relationship with Volt and is a condition of your employment.

For further details, please contact your Human Resources Department.

## PERSONNEL RECORDS AND PRIVACY

Information maintained in the personnel file is treated confidentially and is only released to anyone outside Volt with your written permission or to comply with legal requirements. Supervisors and other employees are prohibited from providing personal or employment references on former or current employees.

Volt will not provide to any credit reference, potential employer or any other non-law enforcement agency any information other than your dates of employment and job title unless you provide a release in writing.

## CORRECTIVE ACTION

The Company reserves the right, at its discretion, to terminate the employment of any of its employees at any time, with or without cause. Without limiting the Company's discretion, supervisors may, in most cases, use the following disciplinary procedures. However, supervisors are also authorized to shorten or by-pass these procedures based on their evaluation of the circumstances.

*Oral warning:* In a frank and open manner, the supervisor should identify the employee's problem and together they can determine ways for the employee to improve. During this oral warning, the supervisor will point out the consequences of not correcting the problem up to and including termination. If the situation does not improve, the supervisor may repeat the measure or implement a more severe option. Of course, the employee will have the opportunity to respond and present facts that might change or improve the situation.

*Final/Written warnings:* If discussions between the supervisor and employee fail to improve the situation, more formal action may be necessary. The supervisor will use the appropriate form that the employee is asked to sign to show that he/she had read and understood it. The form will list the points covered in earlier discussions and will specify the expected improvement and timeframe, as well as further action if those performance expectations are not met.

An employee must demonstrate sustained satisfactory improvement before a written warning expires. The employee is expected to maintain satisfactory performance or the corrective action process will continue or termination will result. Human Resources must review any proposed discharge. While on written warning, salary increases will be deferred and the employee will not be eligible for transfer or promotion.

## PERFORMANCE APPRAISALS

the key to moving ahead at Volt is performance. Volt appraises each employee's on-the-job performance periodically. The exact frequency of performance appraisals will depend upon which Division employs you. Also, it is the option of every manager in each Division to review your performance more frequently if the conditions merit it. This review will be based upon specific performance criteria. These appraisals will be a factor in determining merit increases and promotability, if appropriate.

Your performance appraisal is a useful document. It lists areas where you are strong and areas where you could use some improvement. Your supervisor will include ideas, suggestions and steps for you to follow to make these improvements. Performance appraisals can benefit your future performance.

Your supervisor will discuss your appraisal with you. This can lead to better communication between the two of you. It helps you clarify expectations of each other, raise questions, get answers, talk over good points and areas needing improvement as well as set goals for the future.

Although every effort will be made to perform evaluations on or about the scheduled employee's review date, delays may occur. Employees will be asked to sign the appraisal form to assure that they have seen and discussed their appraisal with their supervisors.

## EMPLOYEE CLASSIFICATIONS

A regular full-time employee is an employee who is regularly scheduled to work a minimum of thirty (30) hours per week.

A regular part-time employee is an employee who is regularly scheduled to work less than thirty (30) hours per week.

An on-call employee has no regular schedule of hours and is called to work on an as needed basis as determined by his/her supervisor.

A temporary employee, working directly for Volt, is defined as an employee holding a job of limited duration arising out of special projects, abnormal work loads or emergencies.

Regular employees noted above are divided into two classes, "Exempt" or "Non-Exempt".

**Exempt Employee** - An employee whose job duties, responsibilities, and salary place them in a bonafide executive, administrative, professional, or outside sales capacity for purposes of the Federal Fair Labor Standards Act and applicable state law.

**Non-Exempt Employee** - All other employees who are not classified as Exempt are classified as Non-Exempt. Non-Exempt employees must be paid for all overtime hours worked in accordance with the Fair Labor Standards Act and/or applicable state laws.

24

# II. YOUR BENEFITS

## HEALTH AND DENTAL INSURANCE

Volt provides comprehensive hospitalization, medical, prescription drug plan and dental insurance coverage for you and your eligible dependents on the first of the month following one month of continuous employment. Regular full-time employees who are regularly scheduled to work a minimum of 30 hours per week are eligible for coverage. Plan details are described in a separate booklet, which you will obtain from your supervisor or the Benefits Department. Should any conflict exist between the plan documents and the information in this handbook, the plan documents will govern.

To enroll, please review, complete and return your enrollment form(s) to your supervisor within the first two weeks of your employment. Your supervisor will forward your enrollment form(s) to the Benefits Department for you. If your enrollment form(s) is not submitted within the first two weeks of employment, your next opportunity to participate in the plans will be during Volt's annual open enrollment period.

Employees and Volt share the cost of these coverages. Volt Information Sciences, Inc. reserves the right to make changes in the Benefits Coverage and in the level of contributions required. Your pre-tax contributions occur weekly through payroll deductions if you authorize your contributions to be made on a pre-tax basis by completing the appropriate form, which accompanies your medical and dental information package.

## MODIFIED HEALTH CONTRIBUTION PLAN

Through the use of this Plan, you will be taking maximum advantage of tax laws which offer substantial tax savings. The IRS Section 125 allows employee contributions for health insurance premiums to be paid before federal and state taxes, and Social Security (FICA) taxes are deducted.

Under the Plan, the amount of your insurance payment does not change and neither do the benefits you receive, but your take home pay will increase.

The Company reserves the right to amend or terminate this Plan and Trust at any time, to any extent and in any manner it may deem necessary or appropriate, by means of action of the Board of Directors. Should any conflict exist between

25

the plan documents and the information in this handbook, the plan documents will govern.

## COBRA RIGHTS

The Consolidated Omnibus Reconciliation Act of 1985 (COBRA) allows eligible employees and their dependents the option of continuing their group health/dental insurance under specified conditions. If you participate in Volt's Medical/Dental Insurance Plans and you become ineligible for medical/dental coverage as a result of reduction in work hours or termination (for reasons other than gross misconduct), you and your dependents are eligible to continue insurance up to 18 months. The costs of continuing coverage for you and your eligible dependents are paid for entirely by you. In addition, you will be charged an administrative fee as allowed by law. Your dependents are eligible to continue their insurance for up to 36 months under specified conditions. For a detailed description of your COBRA rights, please refer to your Medical/Dental Plan information package.

## BASIC LIFE INSURANCE AND SUPPLEMENTAL LIFE INSURANCE ACCIDENTAL DEATH & DISMEMBERMENT

All regular full-time employees are eligible to participate in our Basic Group Life (Term) Insurance Program on the first of the month following one month of continuous employment. Volt pays for the total cost of this coverage.

Exempt and Non-Exempt employees may elect to purchase Supplemental Life Insurance equal to that which the company provides under the basic plan. The cost of the life insurance is based on the prevailing contribution rates.

**Accidental Death & Dismemberment** coverage is equal to the amount of insurance you are entitled to under basic life plan. Eligibility is the same as the Basic Life Plan and coverage is company paid.

Please refer to the benefits booklet appropriate for your division for details. Volt Information Sciences, Inc. reserves the right to make changes in the Benefits Coverage and in the level of any contributions required. Should any conflict exist between the plan documents and the information in this handbook, the plan documents will govern.

## WORKERS' COMPENSATION INSURANCE

If you are injured or become ill during the course of your job and as a result of your work, you may be entitled to Workers' Compensation Benefits (medical and lost time benefits) in accordance with the law of the state in which you work. Any work-related illness or injury must be reported immediately to your supervisor. Employees may elect to use earned sick leave or vacation to pay the difference between Worker's Compensation payments and the employee's regular wage rate during time lost due to the eligible illness or injury.

For leave of absence policy relating to Workers' Compensation, please refer to section on Leaves of Absence.

## BUSINESS TRAVEL INSURANCE

Volt provides Travel Accidental Death and Dismemberment Insurance for accidents which may occur on a company authorized business trip. Volt also provides a Worldwide Assistance Program for all employees who travel on authorized company business. Coverage for each program begins on your first day of employment and is paid for by the Company. If you are covered for travel other than business travel under these programs, you will be specifically notified of your extended coverage.

## LONG-TERM DISABILITY INSURANCE

The Long-Term Disability Plan is designed to provide partial income protection in the case of a disabling illness or injury. Regular full-time salaried, Exempt employees are eligible to participate on the first of the month following one month of employment. You will be advised if you are required to contribute to the cost of the coverage.

To learn the details of the coverage, please contact your Human Resources department.

Volt Information Sciences, Inc. reserves the right to make changes in the Benefits Coverage and in the level of any contributions required. Should any conflict exist between the plan documents and the information in this handbook, the plan documents will govern.

## PERSONAL AND SICK TIME

Full time non-exempt employees who are scheduled to work forty (40) hours per week regularly may be paid for absence due to illness or personal reasons after completing one year of employment at Volt Telecommunications Group, Inc. Your sick/personal time does not accumulate from year to year. The maximum amount of personal or sick leave that may be paid in any calendar year is forty (40) hours; an employee scheduled for thirty (30) hours per week regularly may be paid a maximum of thirty (30) hours in any calendar year. Each employee is required to call his/her Supervisor within one hour prior to his/her scheduled starting time if he/she expects to be absent from work. Employees must contact your Supervisor each day you are absent from work.

Absence in excess of three consecutive days requires a physician's note. Absence, paid or unpaid, if excessive, can lead to discipline up to and including termination. Unused sick pay is not paid upon separation.

Exempt employees may be paid for personal and sick leave at the discretion of their managers.

## SALARY CONTINUATION PROGRAM

Exempt employees who regularly work a minimum of forty (40) hours per week and who have completed six months of continuous employment are eligible for benefits, dependent upon medical necessity, under Volt's Salary Continuation Plan.

For serious and/or extended illness which exceed one week in duration, salaried employees will receive compensation based on the employee's length of service. The employee must provide a medical certification.

If eligible, you will receive six (6) weeks' salary continuation following six (6) months of continuous service. An additional week is earned for each month of service thereafter, to a maximum of thirteen (13) weeks in a twelve-month period.

Volt's Salary Continuation Plan coordinates benefits with any Short-Term Disability payments as mandated in the States of California, Hawaii, New Jersey, New York, Rhode Island, and the Commonwealth of Puerto Rico. In no event will the combination of Salary Continuation payments and Disability payments exceed an employee's normal weekly salary. Your paid disability leave is credited against your FMLA (Family Medical Leave Act) leave entitlement.

Under no circumstances will Salary Continuation be paid to an employee: for absences not due to employee's illness or injury; to extend a vacation, for military duty or upon termination of employment.

## HOLIDAYS

As a full-time employee you are entitled to eight paid holidays per year. They are

| | |
|---|---|
| New Year's Day | Labor Day |
| President's Day | Thanksgiving Day |
| Memorial Day | Day after Thanksgiving |
| Independence Day | Christmas Day |

Full-time employees are scheduled to work at least 30 hours or more per week. To qualify for holiday pay, you must work the scheduled work day before and after the holiday except in the case of approved vacation time. Should you be unable to work either of these two days because of illness, a physician's note will be required to receive holiday pay.

If you are a Non-Exempt employee and asked to work on a scheduled holiday, you will receive your holiday pay plus an extra day's regular pay.

## 401(k) SAVINGS PLAN

As a regular full-time employee of Volt Information Sciences, Inc. or any of its participating subsidiaries or affiliates, and who is not assigned to work at a third party, you are eligible to join the Plan as of your date of hire. You can set aside tax-deferred funds through payroll deductions to provide for your retirement. Tax deferred means that you do not pay taxes on these savings or on the interest and dividend accumulations until you receive the funds. You may elect to contribute up to 15% of your total earnings on a pretax basis. Employees defined as "highly compensated" according to IRS regulations (those earning over $85,000) may be restricted to a lower contribution level starting with the second year of employment.

The plan offers a number of investment options and you may choose how your account is to be vested from among a menu of available investments, including Company Stock. Your contributions and subsequent investment earnings are fully vested. The Company will make a matching contribution of 50% of the first 3% of salary contribution by eligible participants in the Volt Information Sciences Inc. Savings Plan. For employees with less than five years of service, the Company matching contributions will vest at 20% per year over a five year period (providing you work 1000 hours in each year) at which time you will be fully vested. Thereafter, you will own all of the matching contribution already made as well as all future

matching contributions. Employees who already have five (5) or more years of service in which they worked at least 1000 hours are immediately fully vested. You are always 100% vested in your own contributions.

The Company matching contribution will be made twice a year about June 30 and about December 31 of each year. If an employee leaves before June 30 or December 31, he or she will be entitled to whatever vested Company matching contribution is due at the time of termination. In general, employees cannot withdraw funds from the Plan during employment, except upon a severe hardship, as defined IRS regulations. Employees may also borrow up to 50% of their accounts, to a maximum of $50,000.

The Company reserves the right to amend or terminate this Plan and Trust at any time, to any extent and in any manner it may deem necessary or appropriate, by means of action of the Board of Directors. All decisions concerning the operation of the Plan and interpretation of the Plan are made by the administrative committee of the Plan on behalf of the Plan Administrator.

Until January 1, 2001, the Company made contributions to a Company sponsored Employee Stock Ownership Plan ("ESOP"). After January 1, 2001, this plan was amended to suspend further contributions and the Company substituted a matching contribution to the 401(k) and the ESOP was merged into the Savings Plan. Those employees who were eligible for the ESOP at the time were fully vested and their funds transferred to a separate account in the 401(k) plan.

A more detailed explanation of the Plan will be provided in the Summary Plan Description ("SPD"), which will be provided to you separately. However, the Plan operates under the terms of a formal plan document. Should there be any conflict between the plan document and the SPD or the information in this handbook, the plan document will govern.

For further information, please contact the Benefits Department. A 401(k) packet and an SPD will be mailed to you as soon as practicable after hire.

*DEPENDENT CARE FLEXIBLE SPENDING ACCOUNT*

The Dependent Care Flexible Spending Account, or "FSA", provides a tax-advantages way for you to pay for dependent care expenses while you (and your spouse) are at work, allowing, you to save money on the cost of these services. New hires are eligible to participate on the first of the month following 30 days of employment.

When you participate in the Dependent Care FSA, you save on taxes. The amount you elect to contribute to the account is taken from your pay on a pre-tax basis. When you incur dependent care expenses, you are reimbursed from your FSA. As

there is also a tax credit program offered by the Federal government, please be sure to read the FSA Brochure in detail to determine whether or not this is the best Plan for you. Should any conflict exist between the plan documents and the information in this handbook, the plan documents will govern.

The Company reserves the right to amend or terminate this Plan at any time, to any extent and in any manner it may deem necessary or appropriate, by means of action of the Board of Directors.

*VACATION*

Full-time non-exempt employees who are scheduled to work forty (40) hours per week regularly and part-time non-exempt employees who are scheduled to work at least thirty (30) hours per week regularly, but less than forty (40) hours per week, and have completed continuous service of at least one year are entitled to take their vacation to the extent of the time accrued as described below.

Voit Telecommunications Group, Inc. provides vacation pay for regular, full-time, non-exempt employees who work at least forty (40) hours per week, but not less than thirty (30) hours per week. During the first year of service, vacation accrues for regular full-time employees at a rate of 3.333 hours per month, and at a rate of 2.5 hours per month for regular part-time employees. Beginning the second year of service, vacation accrues at a rate of 6.667 hours per month for regular full-time employee and 5.0 hours per month for regular part-time employees. After the completion of the fifth year of service, vacation accrues for regular full-time employees at a rate of 10 hours per month and 6 hours per month for regular part-time employees. An employee must be actively employed by Voit on the last day of the service year to qualify for vacation.

If you leave Voit during the first year of service, you will not be paid any vacation. If you leave after the first year of employment, your accrued unused vacation will be paid to you in your final paycheck. No vacation is accrued during any leaves of absence.

Selection of the vacation dates you choose are subject to your supervisor's approval. Preference will be made based upon your length of service with Voit and the needs of the department. Under unusual circumstances, you may carry forward a maximum of 120 hours into the next fiscal year. Any time greater than 120 hours, must be approved by your Vice President/Division Manager and the Vice President, Human Resources, Voit Information Sciences, Inc., New York.

Exempt employees are eligible for two weeks vacation after completion of one year of continuous service, and three weeks vacation after completion of five years continuous service. During the first year of service, vacation accrues at the rate of

6.667 hours per month, during the fifth year of service, vacation accrues at the rate of 10 hours per month.

Pay in lieu of vacation time is generally not permitted since we believe it is important for you to have time away from the job for rest and relaxation.

Volt Telecommunications Group, Inc. reserves the right to amend its vacation policy at any time, to any extent and in any manner it may deem necessary or appropriate.

## CONDOLENCE DAYS

In the event of the death of a member of your immediate family, you will be eligible for a maximum of three consecutive work days off with pay. Immediate family members include parent, spouse, brother, sister, child, grandparent, grandchildren or parent-in-law. One day paid leave may be granted for the funeral of other relatives such as aunts, uncles and cousins. You are expected to contact your supervisor to advise him/her of your absence.

## EMPLOYEE REFERRAL PROGRAM

As a Volt employee, you may be able to refer qualified job applicants to fill open positions at Volt Telecommunications Group. An award will be paid to an employee referring a job applicant if that applicant is hired and successfully completes four (4) months of continuous employment. Employees may refer to the Employee Referral Policy in their new hire package or contact Human Resources for details.

## REINSTATEMENT OF BENEFITS (BRIDGING)

In the event you return to work for Volt, you will be eligible for health care coverage on the first of the month following one month of continuous employment. Also, if you return within a five-year period, your previous Volt employment service will be used to calculate your vacation entitlement. You are eligible to join the 401 (k) Plan immediately.

(12/14/2001)

# III. LEAVES OF ABSENCE

Volt recognizes that there are occasions when employees require a leave of absence from work. Therefore, it is the Company's policy to grant leaves of absence without pay for reasonable and definite period of time. You may apply for the following leaves:

**Military Leave:** Volt will grant unpaid absences because of military reserve obligations as required by law. You may use your available vacation time, if you wish, while on military leave. Please notify your supervisor of your military leave dates.

**Family Medical Leave (FMLA):** Each qualifying employee will have up to 12 weeks of unpaid family leave during a "rolling" 12-month period measured backward from the date an employee uses any FMLA leave for: (1) the birth and care of a newborn; (2) adoption or foster care of a child; (3) to provide care to an employee's spouse, son, daughter or parent who has a serious health condition; and (4) the employee's own serious health condition which makes the employee unable to perform his/her job functions. You are eligible for a Family Medical Leave if you were employed by the Company for at least 12 months and performed at least 1250 hours of service during the previous 12-month period. The state in which you work may have its own Family Medical Leave law. For specific details, please ask your supervisor for a copy of Volt's Family Medical Leave Policy.

**Pregnancy Disability Leave:** Consistent with the requirements of law regarding Pregnancy Disability Leave, please contact Human Resources or your Branch Manager for specifics on Volt's policy in the state where you work which may differ from the federal FMLA and Volt's policy.

**Workers' Compensation Leave:** A maximum of three months' unpaid absence may be granted to an employee for a health condition related to a workers' compensation claim. At the end of your medical leave, you will be returned to the same or similar position, unless the position has been eliminated.

You do not earn paid-time off while on an unpaid leave of absence that lasts for three weeks or more. Should the policy be found to conflict with laws in the State where you work, Volt will comply with the higher standard.

**Jury Duty Leave:** Upon presentation of a summons, employees will be granted a leave of absence for jury duty. You will receive your regular pay for up to two (2) weeks. However, any compensation you receive for

(12/14/2001)

your service exclusive of travel must be submitted to Volt Accounting. If Jury Duty is more than two (2) weeks, you may use your available vacation benefit to meet this obligation. Please contact your supervisor immediately when you receive your jury summons. He or she will need a copy of the summons to justify your absence.

Failure to return from a leave on the expected return date will be considered a voluntary resignation.

All other leaves are at the discretion of the Company.

## IV. YOUR PAY

### TIMEKEEPING

Your time card or time sheet is your statement to our Payroll Department of the hours that you have worked each day. All Non-Exempt employees are responsible for punching or signing in and out at the start and end of your work day, at the start and end of the off-duty meal periods, as well as anytime you leave the company premises. Should you forget to punch or sign in or out, your supervisor will write in and initial the actual hours you worked. All time cards/sheets shall be signed by each employee and countersigned by your supervisor. By signing the time card/sheet the employee certifies that all information is complete and correct.

Never punch or sign another employee's time card or time sheet nor permit another employee to punch or sign your time card or time sheet. Any of these acts are grounds for immediate termination.

It is your responsibility to accurately maintain a time card or time sheet on a daily basis and to submit it to your supervisor for signature weekly. Cards/Sheets can be obtained from your supervisor.

### PAYDAY

Pay checks are normally issued every Friday for work performed the previous week.

### PAYROLL DEDUCTIONS

The law requires employers to withhold Federal, State, City Income Tax, and State Disability, if applicable, social security (FICA) from the employee's regular pay, overtime, or any other type of compensation for work performed. You may also authorize Volt to deduct for certain health and welfare benefits, 401(k) program, dependent care, certain savings account or credit unions and amounts authorized by the Collective Bargaining Agreement (if applicable). You will receive a record of all deductions on each paycheck stub as well as your gross and net pay and year-to-date earnings. Questions regarding your paycheck should be referred to your supervisor.

You may arrange to have your net pay deposited directly to your bank account. Authorization forms are available from the Payroll Department or your Branch Manager.

*OVERTIME*

There may be times when it is required for Non-Exempt employees to work beyond their normal hours. Overtime work must be authorized and scheduled by your supervisor. Whenever practical, your supervisor will give you advance notice of when you will be needed to work overtime.

Overtime work, when authorized, is normally paid at a rate of time and one half for all hours in excess of 40 hours worked each week unless the law in the state in which you work requires other legal overtime pay. Paid time off for vacation, holidays, or sickness will not be considered as hours worked in the computation of overtime in any one week.

36     (12/14/2001)

# V. WORK ENVIRONMENT

*HOURS OF WORK*

The Company generally follows a normal work schedule of forty hours per week, eight hours per day, for five consecutive days per week.

The weekly and daily work schedule of part-time employees will depend on the nature of their job assignments.

Exempt employees' duties may include work beyond the normal work schedule and weekend assignments, as the activities of the Company require.

The length of meal periods will vary according to the schedule at your workplace but in any event will be no longer than one hour.

*SAFETY*

Keeping our working conditions safe and healthy is everybody's business. If you see anything that poses a safety risk, report it to your supervisor immediately or to the Safety Director or to Human Resources.

Volt requires your participation in emergency drills. You are required to keep your work area free of unsafe or hazardous conditions and to report such conditions to your supervisor. You may do so anonymously and without fear of reprisal.

You are also required to cooperate with Volt's safety rules and regulations. Any violations may be grounds for immediate termination.

According to Volt's Drug-Free Workplace rules every employee who has a work-related accident is subject to successfully passing an alcohol and/or drug test.

*PERSONAL AND PLANT SECURITY*

Any threat or act of violence made to any person or property must be taken seriously and should be reported to your Branch Manager and your Human Resources Department immediately.

37     (12/14/2001)

All packages, including shopping bags, briefcases, handbags or other containers brought onto or taken away from Company' premises are subject to inspection at any time with or without notice. Employees are responsible for safeguarding their own property.

Desks, computers, telephones, file cabinets and other related business equipment are owned by the Company and maintained for business purposes. The Company reserves the right to enter or inspect work areas and facilities, including but not limited to desks, file cabinets, E-mail, voice mail and computer storage disks, with or without notice. The misuse of company property or theft is strictly prohibited.

*ELECTRONIC COMMUNICATION POLICY*

Volt (the "Company" or "Volt") has established the policy set forth below concerning the use of any computer ("Computer") or any telephone system, electronic mail system, voice mail system and facsimile systems (collectively, the "Systems") provided by the Company or the Company's customer (the "Customer") to any Volt employee, agent or consultant ("You") and any correspondence, data and/or information composed, received and/or sent by you on any Computer and/or System. The Company reserves the right to change this policy at any time as may be required under the circumstances, in the Company's sole discretion.

**CAREFULLY READ THE FOLLOWING AS THIS POLICY AFFECTS YOUR RIGHTS TO EXPECTATION OF PRIVACY IN THE WORKPLACE, AS WELL AS WITH THE SYSTEMS AND EQUIPMENT PROVIDED FOR YOUR USE BY THE COMPANY OR A CUSTOMER. FURTHERMORE, A CUSTOMER MAY MAINTAIN ITS/THEIR OWN POLICIES WITH REGARD TO ITS/THEIR COMPUTER AND OTHER SYSTEMS THAT MAY BE EVEN MORE RESTRICTIVE THAN VOLT'S BUT BY WHICH YOU MUST STRICTLY ABIDE.**

1. All Computers and Systems have been provided solely to facilitate business purposes and communications for and on behalf of the Company and/or the Customer. Although you may be assigned a Computer for your use and possess the ability to select an individual password to gain access to the Computer and/or System(s), the equipment and all data and information maintained therein nonetheless belong to the Company or the Customer, as the case may be. The contents of any Computer, e-mail, voice mail and/or fax communications are accessible at all times by an authorized employee of the Company or the Customer and are subject to periodic unannounced inspections with or without your knowledge or approval, and should be treated like any other shared, non-private filing system(s).

2. All passwords and codes which you use on any Computer or System provided to you for work purposes must be regularly made available to your supervisor and/or be supplied upon request. Furthermore, be advised that access to your Computer and e-mail, voice mail and/or fax communications may be obtained with or without your individual password(s).

3. **All information, including but not limited to documents, communications, messages, memoranda, data or code (collectively, "Information") composed on, maintained in, sent or received via any Computer or System is the property of the Company and/or the Customer. The Information is not your private property and you have no expectation of privacy therein. You are warned not to input, install, or download anything that you might consider as belonging to you on any Computer or System provided by the Company or Customer.**

4. Because the Company provides Computers and Systems for the purpose of assisting you in the performance of your job, the Computers and Systems are to be used for official business of the Company and/or the Customer. While the Company recognizes that a certain amount of incidental and occasional personal use of the Computers and/or Systems may occur, which of course must never interfere with your job duties and responsibilities, this information will be treated in accordance with the stated policies herein and will not be considered private. The Customer may have a more restrictive policy with respect to personal use, which may prohibit any personal use of Computers and Systems, even minimal, incidental or occasional use. You must check with your supervisor with respect to any personal, non-business use of the Customer's Computers and Systems.

5. The Company reserves the right to monitor, access and disclose as necessary all data stored on the Computer, e-mail, voice mail and fax communications, without regard to content. Therefore, you should never use any Computer or System to create and/or transmit any document or message that you would not want read or heard by a third party.

6. Back-up copies of e-mail, voice mail and fax communications may be maintained, stored for future purposes and referenced by the Company or the Customer as deemed necessary. Copies of e-mail messages may remain on the provider's system even after they have been deleted by you. Deletion of e-mail does not insure its permanent removal, which may still be accessible by Volt and/or Volt's Customer.

When sending to or from a Company or Customer provided-e-mail system, you must be cognizant of the permanent nature of your messages. While e-mail is an expedient and informal communication, every transmission

7. is a written document. You should exercise the same degree of care when drafting an e-mail message as you would if sending a letter and at all times utilize appropriate professional business etiquette.

You must exercise extreme caution when forwarding an e-mail message or series of messages received from one source to any other. Disclosure of confidential information could have disastrous consequences and subject you to appropriate disciplinary action and potential liability. You are prohibited from forwarding a message marked "confidential" or "private" to any other party without the original sender's express knowledge and consent.

8. Any Computer or System provided for work activities may never be used to transmit inappropriate and/or unlawful communications that may be seen as insulting, disruptive, or offensive by other persons, harmful to morale, or contrary to the business interests of the Customer. Such uses are strictly prohibited. Should you become aware of any such improper or inappropriate uses of Company provided systems, you should promptly notify the Company's Human Resources Department. Examples of inappropriate communications include, but are not limited to:

   • sexually-explicit or implicit messages, cartoons, pictures or jokes;

   • unwelcome propositions or romantic notes/letters;

   • ethnic, sexual, religious or racial statements or slurs;

   • harassment or disparagement of others based on their gender, race, sexual orientation, age, national origin, disability or religious or political beliefs;

   • communication which disparages anyone or any entity, including but not limited to the Company or Customer, or its/their employees;

   • other messages that can be construed to be offensive or unlawful.

9. The Computer and Systems provided to you for work purposes must not be used for soliciting or proselytizing for commercial ventures, religious, political or personal causes, outside organizations or any other non-job-related solicitations.

10. The Company's internal e-mail system includes a "Global Address List" providing for convenient and easy access to Volt employees. You may not send messages to all or a substantial group of the individuals listed on the Global Address List, without proper prior approval from the Company's computer Network System Administrator and the manager of your division/department.

11. The Computer or Systems must not be used to send/upload or receive/download for printing and/or distribution copyrighted materials, trade secrets, proprietary financial information, or similar materials without prior authorization from Volt management and in compliance with applicable laws including but not limited to copyright laws.

12. Access to the Internet is granted via Company's or Customer's Computer system for legitimate business reasons. Time used to survey or browse the Internet must be reserved for business needs and concerns only. You must avoid accessing or downloading information on the Internet that is not job specific or business related. Under no circumstances should a program or executable file be downloaded from an unknown or unsecure site. Any and all files downloaded from the Internet or received via e-mail must be scanned for viruses with a currently updated anti-virus utility approved by the Company or the Customer prior to opening.

13. You will have access to information, which the Company and/or the Company's Customer deems at all times to be confidential, proprietary, trade secret and/or commercially sensitive information belonging to the Company and/or the Company's Customer ("Confidential Information") as a result of your use of Computer or Systems. The same duty of non-disclosure of Confidential Information applies with respect to electronically transmitted or maintained data and information, as with all other files, records, lists, documents, etc. Unauthorized disclosure without the permission of a proper Volt officer, of any Confidential Information, orally or in writing, including but not limited to by use of the e-mail or voice mail systems, is strictly prohibited.

14. Do not install electronic games or other non-approved software applications on any Computer. In the event that a new program and/or other such foreign floppy disk or CD is to be introduced into the Computer, you are required to first contact the system provider's Network System Administrator and/or your supervisor. You will be responsible for any virus or other incompatibility facilitated by your unauthorized use of the Computer and/or Systems.

15. While certain safeguards are used by the Company to prevent unauthorized access to any Computer and/or Systems, they cannot absolutely be guaranteed secure. You must also exercise great care to preserve and protect the security of the Computer and Systems.

16. You are directed not to use the passwords and encryption keys assigned to or created by others to gain access to any Computer or System, nor to disclose your password or other such information to anyone other than your supervisor, unless otherwise instructed by the Company's senior management. Notwithstanding the Company's right to access any

Computer and/or retrieve any System communication(s), communications that do not involve you, should be accessed or read only by the intended recipient.

17. If you discover a violation of these policies, you are required to immediately alert the Company's Human Resources Department. Also, if you have any questions concerning this policy, you should contact Volt's Human Resources Department.

18. **If Volt discovers that you are (i) misusing any Computer or System or (ii) in any way violating this policy, you will be subject to disciplinary action, up to and including termination of your employment and any other legal action that the Company may elect to pursue.**

**SMOKING**

For safety and health reasons, smoking is prohibited at all Volt premises and vehicles.

**SOLICITATION AND DISTRIBUTION POLICY**

From time to time, Volt uses the Company bulletin boards to transmit messages, announcements, safety reminders, general information and government required postings. Bulletin boards may not be used for personal messages or solicitations. No information may be posted without the express permission of Human Resources or your Branch Manager.

Solicitation and/or distribution or circulation of printed or electronic material by employees is not permitted during working time; "working time" does not include lunch breaks, break periods or other authorized times during the workday when employees are not engaged in performing their job functions. Distribution or circulation of printed material by employees is not permitted at any time in working areas. Solicitation or distribution of any printed material on behalf of any individual, organization, group or society by non-employees is not permitted at any time on Company premises.

**TAPING/EAVESDROPPING ON CONVERSATIONS**

It is the policy of Volt to encourage open communications among our employees and between employees and management. To facilitate such open communications, and to ensure compliance with applicable federal, state, and local wiretapping, eavesdropping, and privacy laws, Volt has instituted the following policy:

Without the prior written authorization of the Company's General Counsel or Vice President, Human Resources, no employee may openly or secretly tape or otherwise surreptitiously record or videotape any conversation, communication, activity or event. This prohibition applies to any conversation, communication, activity or event which in any way involves the Company or employees of the Company or any of the Company's subsidiaries or affiliate companies, or any customers or clients, or any other individual or other entity with whom the Company is doing business or intending to do business in any capacity.

"Taping" and "Recording" under this policy includes the taping or recording of any conversation or communication, regardless of whether the conversation or communication is taking place in person, over the telephone, or via any other communications device or equipment, and regardless of the method used to tape or record, and regardless of where the conversation or communication takes place, i.e. whether on or off the Company's premises.

No employee may eavesdrop on the conversations or communications of other employees or non-employees.

Violations of this policy may result in disciplinary action up to and including termination of employment. This policy applies even in instances where applicable law does not prohibit taping or recording. In addition, where the conduct engaged in is illegal under applicable law, violators may also be subject to prosecution under applicable federal, state, or local laws.

If you have any questions or concerns regarding whether any contemplated taping or recording would violate this policy, you should discuss the matter with the Vice President, Human Resources before engaging in any such activities.

**VOLT NEWSLETTER**

The VOLT Newsletter is published three times a year by the Public Relations Department for employees of VOLT INFORMATION SCIENCES, INC., its Divisions and Subsidiaries. The newsletter provides employees with current information on the activities within the divisions and subsidiaries of Volt. News

and feature articles submitted by employee correspondents from across the United States and overseas cover such events as new contracts, new technology, acquisitions, new office openings, community service projects and notable performances by Volt employees. The "PEOPLE" section of the newsletter highlights significant employee announcements such as employee service anniversaries, promotions, transfers, marriages, births and graduations.

In addition, your subsidiary produces a newsletter specific to the events of Volt Telecommunications Group. You are encouraged to submit articles of interest to the Marketing Department.

## EXIT INTERVIEWS

In the event your employment with Volt ends, an exit interview may be conducted. The purpose of the exit interview is to survey your opinions and recommendations concerning your employment with Volt. You will be asked to complete an Exit Interview form for discussion purposes.

# VI. STANDARDS OF CONDUCT

## STANDARDS OF CONDUCT

Standards of conduct at Volt are not for the purpose of restricting the rights and activities of employees, but are intended to help employees by defining and protecting the rights and safety of all persons — employees, visitors and customers. Infractions may result in disciplinary action, suspension or termination, depending on the severity or degree of violation. Such infractions include but are not limited to the following:

a. Unauthorized disclosure of confidential information belonging to: Volt and/or its customers.

b. Unauthorized use, possession and/or sale of intoxicating beverages, narcotics or non-prescriptive or illegal drugs on company property or reporting to work under the influence of same. Employees are expected to report any prescriptive and non-prescriptive drugs that may impair their work.

c. Unauthorized possession of firearms and other weapons on company property.

d. Non-compliance with the company's Equal Employment Opportunity Policy.

e. Sexual harassment or other unlawful harassment of another employee.

f. Neglect of job responsibilities or unsatisfactory performance.

g. Sleeping while on scheduled work time.

h. Dishonesty, stealing or unauthorized use or destruction of company equipment or property. Stealing or unauthorized use of personal property belonging to any employee or customer.

i. Engaging in fights or horseplay on company property.

j. Insubordinate conduct towards any supervisor or manager.

k. Unexcused and/or excessive lateness and absenteeism.

l. Failure to report absence within the prescribed time.

m. Smoking in unauthorized areas.

n. Violating safety or health rules or practices or engaging in conduct that creates a safety or health hazard.

o. Any illegal activity, including gambling, is prohibited on company property.

p. Professional misconduct.

q. Willful destruction of property.

r. Indecent or unlawful conduct detrimental to the best interests of Volt.

s. Removing or defacing any notice or bulletin, or other information posted on the company's bulletin boards.

t. Soliciting or accepting substantial gratuities or gifts is prohibited.

u. Falsification or unauthorized altering of records, employment applications, time sheets, time cards, etc.

v. Operating a company vehicle without a valid Driver's License; driving a company vehicle without permission or allowing a non-authorized person to drive a company vehicle or driving a company vehicle under the influence of intoxicating beverages, narcotics or non-prescriptive drugs.

Your supervisor can answer any questions you have regarding Standards of Conduct.

# VII. GLOSSARY OF TERMS

**Aliens** A person born in and owing allegiance to a country other than the one in which he or she lives.

**American Arbitration Association** A public service, non-profit organization established in 1926 and provides alternative dispute resolution services. The Association appoints an arbitrator that acts as a judge.

**Amendment** An alteration of or addition to a bill, document, etc.

**Arbitration** The hearing and determination of a case in controversy by a person chosen by the parties or appointed under statutory authority.

**Board of Directors** An official group of individuals who direct or supervise an organization.

**Breach** Violation of a law, obligation, or standard.

**Commission** Incentive plan that rewards employees, at least in part, based on their sales volume.

**Common Stock** Capital stock other than preferred stock.

**Disciplinary Action** Action taken against an employee when the employee has violated an organizational rule or when the employee's performance has deteriorated to the point where corrective action is needed.

**Discrimination** Prejudiced or prejudicial outlook, action, or treatment.

**Dividends** A share of surplus allocated to stockholders.

**Equal Employment Opportunity** Refers to the right of all persons to work and to advance on the bases of merit, ability and potential.

**Equal Employment Opportunity Commission** Federal agency created under the Civil Rights Act of 1964 to administer Title VII of the act and to ensure equal employment opportunity; its powers were expanded in 1979.

**Exempt** Employees are not covered by the Fair Labor Standards Act (FLSA). They are exempt from overtime under FLSA executive, administrative, or professional categories.

**Fair Labor Standards Act** Was passed in 1938. Its primary requirements are that individuals employed in interstate commerce or in organizations producing goods for interstate commerce must be paid a certain minimum wage and must be paid time and a half for hours over 40 worked in one week. The most complex parts of the law deal with possible exemptions from paying overtime wages.

**Fiscal Year** An accounting period of twelve months.

48

***Immigration Reform & Control Act of 1986*** Was passed in 1986 making it illegal for anyone to hire, recruit, or refer for employment in the United States a person knowing that he or she is an unauthorized alien. A company must attest under penalty of perjury that it has verified that the individual is not an unauthorized alien.

***Incentives*** Pay plans designed to relate pay directly to performance or productivity; often used in conjunction with a base wage/salary system.

***Infraction*** An act or an instance of violating a law, rule, policy, etc.

***Interest*** An excess above what is due.

***Non-Exempt*** Employees are covered by the Fair Labor Standards Act; they must be paid overtime and are subject to a minimum wage.

***Performance Criteria*** Specific standards/goals that provide a consistent definition of quality. They should be measurable, challenging and realistic. Performance criteria should be agreed upon prior to the beginning of the performance period.

***Permanent Residence*** The act of dwelling in a place for some time.

***Pre-tax Contributions*** Allows employee contributions for health insurance premiums to be paid before federal and state taxes, and social security (FICA) taxes are deducted from wages.

***Prevailing Party*** A person or group that maintains a side of a question or dispute and obtains victory.

***Professional Misconduct*** Any behavior inappropriate for the workplace such as but not limited to dishonesty, screaming, inappropriate language, not abiding in Volt's policy.

***Protected Classification*** A specific group of people protected under various laws and regulations against discrimination in the workplace.

***Remedies*** The legal means to recover a right.

***Retaliation*** To get revenge.

***Service Year*** The number of completed years of services based on an employee's hire date.

***Statement of Insurability*** A medical questionnaire used to determine insurability under specific benefit plans such as health, long-term disability, life, etc.

***Solicitation*** The act or an instance to make petition to: to approach with a request.

***Summons*** A call by authority to appear in court.

***Tax-Deferred Funds*** An opportunity to save your money for retirement tax free. These monies are excluded from your taxable earnings as stipulated by government regulation.

***Trust*** The care or management of property or funds by a person or a bank for the benefit of another.

# EXHIBIT D

## ACKNOWLEDGMENT

I, _ANDREW M. CURRY_ (Print Name), have received my copy of the employee handbook of Volt Telecommunications Group, Inc., a wholly owned subsidiary of Volt Information Sciences, Inc. I understand that this handbook is intended to provide me with information about the Company's general policies and is not a contract of employment. I understand that both the Company and I have the right to terminate my employment with or without notice and with or without cause at any time and that no Company officer except the President and/or Executive Vice President of Volt Information Sciences, Inc. has any authority to enter into any agreements for employment or to make any agreement contrary to the foregoing and any such agreement must be a written and signed agreement.

I will read and follow the policies described in the handbook. I understand that violation of any of the Company's written or unwritten rules, personnel policies or practices may result in my immediate discharge. I understand that the Company has the right to change, interpret, or cancel any of its published or unpublished personnel policies, benefits or practices without advance notice. Because the Company's policies may change from time to time, I have been instructed to check with my supervisor if I have a specific question about any Company policy or practice.

I have read, understand, and agree to be bound by the Company's Discrimination Complaint Procedures, including Arbitration, and expressly waive my right to sue the Company, its agents and employees, in court and I agree to submit to final and binding arbitration any dispute, claim or controversy arising between me and the Company that I would have been otherwise entitled to file in court.

Date _13 March 2002_

Printed Name _ANDREW M. CURRY_

Signature of Employee _Andrew M. Curry_

(12/14/2001)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANDREW CURRY,

                              Plaintiff,                    Civil Action No. 07 CV 7158 (DC)

          -against-                                        **AFFIDAVIT OF SERVICE**

VOLT INFORMATION SCIENCES, INC. and
VOLT TELECOMMUNICATIONS GROUP, INC.,

                              Defendants.
-----------------------------------------------------------------X

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

          I, **WENDY ISBISTER,** being duly sworn, state:

          I am not a party to the action; am over eighteen (18) years of age; and reside in

Pawling, New York.

          On **November 9, 2007**, I served a copy of a **Notice of Motion with Supporting**

**Papers**, by depositing a true copy of the same, enclosed in wrapper, via overnight mail under the

exclusive care and custody of FedEx, addressed to the following at the last know addresses set

forth below:

To:      Jonathan Ben-Asher, Esq.
         Beranbaum Menken Ben-Asher & Bierman LLP
         80 Pine Street, 32nd Floor
         New York, New York 10005

                                                        Wendy L. Isbister

Sworn to before me this
9th day of November, 2007

         Notary Public
         LUCILLE ORTIZ
NOTARY PUBLIC, State of New York
         No. 01OR4722675
     Qualified in Nassau County
Commission Expires Feb. 28, 2011