UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

ANDREW CURRY,

                      Plaintiff,

   -against-

Volt Information Sciences, Inc. and
Volt Telecommunications Group, Inc.

                      Defendants.

-----------------------------------------------------------------

Civil Action No.
07 CV 7158 (DC)

PLAINTIFF ANDREW CURRY'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

BERANBAUM MENKEN BEN-ASHER & BIERMAN LLP
Attorney for Plaintiff Andrew Curry
JONATHAN BEN-ASHER (JB-A 4572)
KRISTEN E. FINLON (KEF 2575)
80 Pine Street - 32nd floor
New York, N.Y. 10005
Telephone: (212) 509-1616
Facsimile: (212) 509-8088

## PRELIMINARY STATEMENT

Plaintiff Andrew Curry submits this Memorandum in opposition to defendants' motion to compel arbitration and stay this action.

Plaintiff does not dispute that courts have accepted arbitration as a means of resolving many employment disputes or that claims under Sec. 806 of the Sarbanes-Oxley Act ("SOX") may be arbitrable. However, under the caselaw, defendants cannot compel arbitration when the purported arbitration agreement is illusory. The court should reject defendants' request to hold plaintiff to a clause in an employment handbook, when the handbook, by its explicit terms, is not binding, and when defendants reserve to themselves the right to change or abrogate those terms at any time.

## STATEMENT OF FACTS

In March 1998, Mr. Curry was hired as the Director of Management Services for defendant Volt Telecommunications Group, Inc. ("VTG"), a wholly owned subsidiary of defendant Volt Information Sciences, Inc. ("VIS"). See Complaint (Defendants' Motion to Compel, Ex. A) at ¶¶ 15-16, 21. VIS is a publicly traded corporation with a class of shares registered under § 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d). See id. at ¶ 15. VTG is in the business of designing, engineering, constructing, installing, and maintaining voice, data, and video infrastructures for the private sector and for government agencies. See id. at ¶ 16.

Under Mr. Curry's direction, the Management Services Group was responsible for bringing VTG into compliance with ISO 9001 and TL 9000, international and industry-

wide standards.[1]  See id. at ¶¶ 23, 31.  VTG had never been certified under either standard.  See id. at ¶ 30.  Most major telecommunications and IT companies require certification under both standards from their suppliers, and indeed, VTG had assured one of its principal customers that it was in the process of completing certification.  See id. at ¶¶ 26, 31.  Obtaining and maintaining certification required numerous audits, both internal and external, to ensure compliance with approved procedures.  See id. at ¶¶ 27-29.  The creation of internal procedures and conducting of internal audits were a significant portion of Mr. Curry's work.  See id. at ¶¶ 31-33.

In the course of a 2005 audit of the Contract Administration and Procurement Management ("CAPM") division, Mr. Curry found serious deficiencies in the division's compliance with VIS's SOX procedures regarding contract administration, engagement of subcontractors, and procurement of materials.  See id. at 34, 38-42.  These deficiencies were material, with costs running into the millions of dollars.  See id. at 43.  Mr. Curry's report on this audit specifically identified the SOX requirements and improprieties.  See id. at 42.

In the months that followed, Mr. Curry filed numerous complaints, both internal and external, regarding the SOX violations he had uncovered in the course of his internal audits.  He wrote memos to VIS's CEO, William Shaw, and had several meetings with VIS's Vice President of Internal Accounting in the summer of 2005 to discuss his

---

[1] The ISO standards were developed by the International Organization for Standardization ("ISO"), which determined standards for businesses worldwide in a variety of areas.  The ISO 9001 standard is primarily concerned with "quality management," including meeting applicable customer and regulatory requirements.  See Complaint at ¶ 24.
   The TL 9000 standard was developed by the Quality Excellence for Suppliers of Telecommunications ("QuEST") Forum, based upon the ISO 9001 with additional requirements particular to the telecommunications and IT industries.  See id. at ¶¶ 25-26.

findings. See id. at ¶¶ 45-46. Additionally, he wrote memos to VIS's General Counsel outlining his findings and requesting whistleblower protection. See id. at ¶ 49. He also brought information to the attention of government agencies, filing a complaint with the Internal Revenue Service concerning payroll tax fraud by VIS and sharing his findings with the New York State Attorney General's Office. See id. at ¶¶ 47-48.

VTG took a series of retaliatory actions against Mr. Curry for his audits and other protected activities in violation of § 806 of SOX. These actions included the selective enforcement of a new policy prohibiting telecommuting, targeting the members of the Management Services Group, by VTG President R.J. Anderson; Mr. Anderson's proposal of the elimination of Mr. Curry's group, ostensibly as part of a company-wide cost reduction; reduction in the Management Services group's budget; and transfer of two employees in the group to other departments. See id. at ¶¶ 44, 51-52, 57-59. Mr. Curry wrote memos to Mr. Shaw and to VIS's General Counsel, bringing these retaliatory actions to their attention and warning that he would file a complaint with the Department of Labor against VTG for its violations of § 806. See id. at ¶¶ 51, 53-54. Ultimately, the defendants terminated Mr. Curry's employment in July 2006, again ostensibly as a cost-cutting measure. See id. at ¶ 60.

In September 2006, Mr. Curry filed a charge against the defendants under § 806 with the United States Department of Labor, Occupational Health and Safety Administration. See id. at ¶ 7. In February 2007, OSHA determined that Mr. Curry had engaged in protected activities under § 806, that he had a reasonable belief that he was reporting fraud on the defendants' shareholders, and that the defendants had known of his protected activities. See id. at ¶ 9. However, OSHA concluded that there was no nexus between Mr. Curry's activities and his termination, and thus found that there was no

reasonable cause to believe that defendants had violated § 806. See id.

On August 10, 2007, Mr. Curry filed the complaint in this action. The Defendants now move, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., to compel arbitration of Mr. Curry's claims. In support of their motion, the Defendants rely on Mr. Curry's signature on the "Acknowledgment" form of VIS's "In-House Employee Handbook," which they argue created an arbitration agreement. See Defendant's Mem. of Law.

In March 2002, four years after he was hired, Mr. Curry signed an "Acknowledgment" form, identical to the one contained in the Handbook, stating that he had received a copy of the Handbook. See Defendants' Motion to Compel, Ex. D. That form states, "I understand that this handbook is intended to provide me with information about the Company's general policies and is not a contract of employment," and that, "I understand that both the Company and I have the right to terminate my employment with or without notice at any time and with or without cause at any time[.]" Id. The form goes on to state:

> I understand that the Company has the right to change, interpret or cancel any of its published or unpublished personnel policies, benefits or practices without advance notice. Because the company's policies may change from time to time, I have been instructed to check with my supervisor if I have a specific question about any Company policy or practice.
>
> I have read, understand and agree to be bound by the Company's Discrimination Complaint Procedures, including Arbitration, and expressly waive my right to sue the Company, its agents and employees, in court and I agree to submit to final and binding arbitration any dispute, claim or controversy arising between me and the Company that I would have been otherwise entitled to file in court.

Id.

The introduction to the Handbook emphasizes that "The information contained in

this employee handbook has been prepared as a general guide regarding Volt Information Science's policies, practices, and procedures," and that "Different divisions may have different policies." Defendant's Motion to Compel, Ex. C at 7. The introduction warns:

> [T]he policies, benefits, practices and procedures contained in this book, and those that may be issued from time to time, are not a contract of any kind. Although they reflect current policy, they may be changed or rescinded at any time without prior notice at the Company's discretion.

Id. Finally, employees are advised that "your employment relationship with Volt is **at-will**. Employment at-will reserves the company's right and your right to terminate your employment at any time for any reason, with or without cause." Id. (emphasis in original).

The Handbook's provision on Alternative Dispute Resolution provides, in relevant part:

> Any dispute, controversy or claim which was not settled through the Concerns and Issues Procedures, and arises out of, involves, affects or relates in any way to any employee's employment or a claimed breach of that employment relationship or the conditions of your employment or the termination of employment, including but not limited to disputes, controversies or claims arising out of or related to the actions of Volt's other employees, under Federal, State and/or local laws shall be resolved by binding arbitration. The applicable rules of the American Arbitration Association in the state where employee is or was last employed by Volt shall prevail....
>
> Arbitration is an essential element of your employment relationship with Volt and is a condition of your employment.

Id. at 20-21.

## ARGUMENT

### The Court should deny Defendants' Motion to Compel because there is no binding arbitration agreement between the parties.

In order to grant Volt's motion, the Court must determine that an agreement to arbitrate actually existed between Mr. Curry and Volt. See Manigault v. Macy's East, LLC, 506 F.Supp.2d 156, 160 (E.D.N.Y. 2007) ("an employee cannot be compelled to arbitrate a dispute in the absence of an agreement to do so"). Although the Federal Arbitration Act "directs courts to place arbitration agreements on equal footing with other contracts, . . . it 'does not require parties to arbitrate when they have not agreed to do so.'" EEOC v. Waffle House, Inc., 534 U.S. 279, 293 (2002), quoting Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989); see also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404, n.12 (1967) ("the purpose of Congress in [enacting the FAA] was to make arbitration agreements as enforceable as other contracts, but not more so."). "While ambiguities in the language of the agreement should be resolved in favor of arbitration . . . , [courts] do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." Waffle House, 534 U.S. at 294.

As the party seeking to compel arbitration, Volt bears the burden of proving by a preponderance of the evidence that an agreement to arbitrate existed. See Tellium, Inc. v. Corning Inc., No. 03 Civ. 8487, 2004 WL 307238 at *5 (S.D.N.Y. Feb. 13, 2004), citing Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 46 (2d Cir. 1993). Under the FAA, agreements to arbitrate may be found invalid, revocable, and unenforceable on the basis of "such grounds as exist at law or in equity for the

revocation of any contract." 9 U.S.C.A. § 2. The question of whether an agreement to arbitrate exists is governed by New York state law. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran, 445 F.3d 121, 125 (2d Cir. 2006); Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002).

To determine whether parties have agreed to arbitration, the Court must determine "whether the parties have entered into a binding contract." Specht v. Netscape Communications Corp., 150 F.Supp.2d 585, 590 (S.D.N.Y. 2001). In this context, "[i]n order for a contract to be binding, both parties must assent to be bound." Id. at 591-92. Unless both parties to a contract are bound "so that either has a cause of action for breach thereof, neither is bound." CN Funding LLC v. Ensig Group Ltd., 18 Misc.3d 214, 846 N.Y.S.2d 555, 559 (Sup. Ct. N.Y. Co. 2007) (granting summary judgment dismissing plaintiff's breach of contract claim, based on lack of consideration, in case not involving arbitration).

On the most basic level, the Handbook and acknowledgment form do not constitute an agreement under New York law. In both documents, Volt took great pains to explicitly caution employees that the company was not bound by the writing. According to the Handbook, it is not a contract "of any kind," and can be changed or rescinded at any time, without notice to the employee, in Volt's discretion. Exhibit C to Defendant's Motion to Compel at 7. The acknowledgment form provides similarly, noting that the handbook is not a contract of employment, and that Volt has the right to change, modify or rescind any of its policies or practices at any time, without notice. Exhibit D to Defendant's Motion to Compel.

The federal and state courts in New York have repeatedly held that disclaimers in

-7-

employee handbooks similar to Volt's preclude enforcement of the handbook's provisions. A handbook which "clearly states it can be altered at any time... and cautions readers and affected persons to seek out the most updated edition.... is hardly the harbinger of a legally binding set of arrangements." Maas v. Cornell Univ., 94 N.Y.2d 87, 94 (1999) (rejecting employee's breach of contract action when handbook contained disclaimer and did not "express or support the implication of any promise on the part of the University.")  As this Court has stated, "an express disclaimer of contractual rights in an employee manual bars an action for breach of contract based on the terms of the manual." Mirabella v. Turner Broad. Systems, Inc., No. 01 Civ. 5563, 2003 WL 21146657 at *2 (S.D.N.Y. May 19, 2003) (handbook stated that its contents were intended as guidelines for employees and did not create contractual obligation), citing Lobosco v. New York Tel. Co./NYNEX, 96 N.Y.2d 312, 317 (2001). See also Wait v. Beck's North America, Inc., 241 F.Supp.2d 172, 185 (N.D.N.Y. 2003) (handbook disclaimer "negate[d] the elements necessary to contract formation; namely mutual assent and consideration" because it disavowed that it created any rights of the employee and provided that it could be changed, supplemented or discontinued at any time); McCooey v. Gen. Motors Corp., No. 90 Civ. 0869E, 1994 WL 464044 (W.D.N.Y. Aug. 9, 1994) (handbook not binding when it disclaimed intent to bind employer and was subject to unilateral modification or termination); Schrul v. Gen. Motors Corp., No. 90 Civ. 0871E, 1994 WL 464041 (W.D.N.Y. Aug. 8, 1994) (same).

In each of these cases, employees asserted contractual rights under their handbooks, but the courts rejected those claims based on the employer's disclaimers of an agreement. The courts properly recognized that parties cannot be bound to a writing that explicitly denies that it is in any way an agreement, and instead reserves to one party

-8-

the right to change or abrogate it. If, because of the disclaimer, plaintiff could not enforce the Handbook and Acknowledgment against Volt, Volt should not be permitted to enforce them against plaintiff.

Courts outside of this District have recognized the inherent inequity of enforcing handbook arbitration agreements against employees who would be precluded from enforcing the handbook because of employer-created disclaimers. These courts have found that if a handbook is not an agreement for an employer, it cannot be an agreement for an employee.

Both the Tenth and the Sixth Circuits have held that an arbitration agreement which gives one party the unrestricted right to change its existence or scope is illusory. In Dumais v. Am. Golf Corp., 299 F.3d 1216 (10th Cir. 2002), the employer's handbook and employee acknowledgment gave the employer the right to amend or revise everything in the Handbook.[2] The court found that the employer's reservation of an "unfettered right" to eliminate or revise the arbitration clause meant that no agreement had been made. 299 F.3d at 1219. In Floss v. Ryan's Family Steak Houses, Inc., 211 F.3d 306 (6th Cir. 2000), the arbitration agreement which the employer required the employee to sign gave the arbitral forum the discretion to change the arbitration rules and procedures, without consent or notice to the employees. The Sixth Circuit found that the

---

[2] The Acknowledgment did preclude the employer from modifying the employee's at-will status, but the court construed the ambiguity between the Handbook and the Acknowledgment against the employer-drafter, and found that the employer had retained the right to revise the arbitration agreement, nullifying any consent.

-9-

arbitration agreement therefore lacked consideration.³

The First Circuit has also indicated that handbook disclaimers like Volt's vitiate a purported agreement to arbitrate. In <u>Ramirez-de-Arellano v. American Airlines, Inc.</u>, 133 F.3d 89, 90 (1st Cir. 1997) the Court, affirming summary judgment for the employer on other grounds, noted that "we have some doubt" about the District Court's ruling that the company's internal grievance procedure in its handbook was the equivalent of binding arbitration "especially so where...the handbook expressly provides that it is not a contract between the parties and is subject to unilateral amendments by [the employer] at any time." The court found that the plaintiff had not voluntarily waived his rights to litigate his claims in court, given the "apparently unilateral and adhesive nature of American's employee handbook." <u>Id.</u>

In <u>United States ex rel. Harris v. EPS</u>, No. 2:05-CV-212, 2006 WL 1348173 (D. Vt. May 16, 2006), the court barred enforcement of an arbitration clause where the handbook, acknowledgment and disclaimer were strikingly like those here. The Handbook required "all legal grievances against the company" to be "submitted to compulsory arbitration." The employee signed an acknowledgment noting that the handbook was not a contract of employment, and agreeing to arbitrate "any and all employment-related legal disputes, controversies or claims I may have arising out of....my employment or cessation of employment[.]" 2006 WL 1348173 at *1-2. In the Handbook, the employer reserved the right to change, revise, eliminate or add to any of the policies, in its discretion, at any time, and noted that the handbook was not intended

---

³ The Fourth Circuit reached a similar result in <u>Hooters of America, Inc. v. Phillips</u>, 173 F.3d 933 (4th Cir. 1999) but relied not only on the employer's reservation of rights to alter the arbitration rules, but a cornucopia of other glaring procedural deficiencies in the arbitration process that made it "egregiously unfair." 173 F.3d at 938.

to create contractual obligations. See id.

The District of Vermont held that since the employer "inserted these disclaimers in an apparent effort to avoid vesting the employee with contractual rights.... [it] cannot conveniently choose to ignore them and argue that the Handbook imposed contractual obligations on [the employee]. The use of language such as "I agree" did not overcome the Handbook's disclaimer and create an agreement to arbitrate. See id. at *5-6.

In Gourley v. Yellow Transp., Inc., 178 F.Supp.2d 1196 (D. Colo. 2001), the employer, like Volt, placed an "Arbitration Agreement" in its handbook, stating that the parties "agreed" to its terms. As here, the employee signed an acknowledgment, reiterating and referring to the handbook's agreement to arbitrate. Both the handbook and acknowledgment specifically disclaimed that they were contracts, and the acknowledgment form provided that the company could rescind or modify any of the handbook's terms at any time. The court found that the parties had not agreed to arbitrate:

> Yellow Cab simultaneously attempts to bind the employee to the Arbitration Agreement as written, while withholding the power to interpret, modify, rescind or supplement its terms unilaterally. Plaintiffs would be irretrievably bound and at the Defendants' mercy, while Defendants are bound to nothing. Such terms in a contract render it illusory, as it binds one party without binding the other.... I therefore conclude that the Arbitration Agreement is no agreement at all.

178 F.Supp.2d at 1202-03.

Similarly, in Harmon v. Hartman Management, L.P., No. Civ. A. H-04-1597, 2004 WL 1936211 (S.D. Tex. Aug. 24, 2004), the employer's handbook contained a broad arbitration provision, covering any dispute arising out of the employment relationship. It stated that by acknowledging receipt of the handbook, the employee agreed to the arbitration procedure. At the same time, the handbook reserved to the

-11-

employer the discretion to add, modify or delete any provisions of the handbook, at any time and without notice, and disclaimed the intention to be an express or implied contract. The court held that the disclaimer made the arbitration clause unenforceable. 2004 WL 1936211 at *2-3. See also Hirschi v. Newcastle Props., Inc., No. 06-CV-01424, 2006 WL 2927493 (D.Colo. Oct. 12, 2006) (no arbitration agreement when handbook disclaimed contractual nature of any company policies, even though arbitration agreement itself stated it created contractual duties).

Defendants here seek to deprive plaintiff of the judicial remedy allowed by Sec. 806 of the Sarbanes-Oxley Act, based on forms having the same inherent defects as the ones these courts have refused to enforce. Volt's Handbook and Acknowledgment form are defendants' creations. Defendants cannot claim that their contents were the subject of any bargaining, negotiation or discussions between the parties. Defendants crafted the papers to give themselves the maximum leeway to "change, interpret or cancel" them without notice, but bind plaintiff and other employees to their terms – whatever they might be or become, at defendants' whim. Under the Handbook and Acknowledgment, defendants could change not only any of the terms of plaintiff's employment, but any aspect of the arbitration, including the arbitral forum, and with it, the associated deadlines, rules, procedures, costs, claims covered and remedies. Plaintiff did not agree to anything on which he could rely, since for all Plaintiff knew, the terms would be different in a matter of months, weeks or days.

Since defendants drafted the Handbook and Acknowledgment form, those documents must be construed against them. Bey v. Eggleton, No. 96 Civ. 3302, 1998 WL 118158 at *3 (S.D.N.Y. March 17, 1998) ("contract terms are construed against the drafter."); Yudell v. Ann Israel & Assocs., Inc., 248 A.D.2d 189, 669 N.Y.S.2d 580 (1st

Dept. 1998) (employment contract); Tenth City Assocs. v. Principal Mut. Life Ins. Co., 215 A.D.2d 149, 626 N.Y.S.2d 108 (1st Dept. 1995) (mortgage). Defendants should not be allowed to obtain the benefit of one-sided agreements on which plaintiff could place no reliance, to force plaintiff to into a forum he did not choose.

The cases cited by Defendants are not relevant to this motion, because in none of them did the employer explicitly and broadly disclaim, as did Volt, that the arbitration document had any contractual aspect and could be modified or abrogated in the company's discretion. Chanchani v. Salomon/Smith Barney, Inc., No. 99 Civ. 9219, 2001 WL 204214 (S.D.N.Y. March 1, 2001); Arakawa v. Japan Network Group, 56 F.Supp.2d 349 (S.D.N.Y. 1999); Beletsis v. Credit Suisse First Boston Corp., No. 01 Civ. 6266, 2002 WL 2031610 (S.D.N.Y. Sept. 4, 2002); Spencer-Franklin v. Citigroup/Citibank, No. 06 Civ. 3475, 2007 WL 521295 (S.D.N.Y. Feb. 21, 2007), *report and recommendations adopted at* 2007 WL 1052451 (S.D.N.Y. April 5, 2007).

Similarly, in Bishop v. Smith Barney, Inc., No. 97 Civ. 4807, 1998 WL 50210 (S.D.N.Y. Feb. 6, 1998), not only was there no disclaimer by the employer, but the arbitration was deemed to have been incorporated in plaintiff's individual employment contract, and plaintiff accepted arbitration as his remedy by filing an arbitration demand, preparing with counsel, proceeding through three days of hearings, and accepting an arbitral award – all strong indications of his assumption of the arbitration agreement, and all absent here.

While the courts in some of these cases also pointed to the plaintiff's continuing employment as evidencing an agreement to arbitrate, Mr. Curry's continuing employment after signing the acknowledgment could hardly constitute "acceptance" here. Volt expressly disavowed the creation of a contract, and Volt had complete liberty to rework

-13-

the terms at its pleasure. Plaintiff did not obtain Volt's agreement to anything in those writings, and there was no agreement for him to affirm by continuing to do his job.[4]

In Boss v. Salomon Smith Barney, Inc., 263 F.Supp.2d 684 (S.D.N.Y. 2003), and Rand v. J.C.Bradford & Co., No. 98 Civ. 4906, 1998 WL 872421 (S.D.N.Y. Dec. 15, 1998), also cited by defendants, the arbitration documents contained no disclaimer, and the plaintiff also executed a Form U-4 for registration with the NASD, agreeing to arbitrate in that forum any dispute with the firm.[5] The plaintiff in DeGaetano v. Smith Barney, Inc., No.95 Civ. 1613, 1996 WL 44226 (S.D.N.Y. Feb. 5, 1996), raised only arguments concerning the fairness of arbitration and her lack of understanding of what arbitration meant. Unlike the papers in issue here, her arbitration agreement was not accompanied by any employer disclaimer or reservation of rights. Similarly, in Baldeo v. Darden Rest., Inc., No. 04-CV-2185, 2005 WL 44703 (E.D.N.Y. Jan. 11, 2005), there was no disclaimer of contractual intent in the arbitration. Mr. Curry, by contrast, received the arbitration policy as part of a document which unequivocally stated that it was not a contract.

Finally, contrary to defendants' contentions, the arbitration agreements in Tuscey v. Volt Information Sciences, Inc., 2001 U.S. Dist. LEXIS 10980 (S.D.N.Y. 2001) (attached to Defendants' Memorandum as Exhibit B) and Gordon v. Volt Information Sciences, Inc., (not reported, but attached to Defendants' Memorandum as Exhibit C)

---

[4] In Chanchani, the employer later issued an Interim Handbook, which modified previous conflicting policies, without requiring employees to sign a receipt. However, it does not appear that any of the documents contained a disclaimer, much less the broad and complete disclaimer drafted by Volt.

[5] The court in Rand did not rule on whether the employer's arbitration policy was an arbitration agreement, but rather granted the motion to compel based on the U-4 the plaintiff had signed. See 1998 WL 872421 at *3.

-14-

have no bearing on the issues here. The employee in Tuscey signed an arbitration agreement as part of his individual employment agreement, and the plaintiff in Gordon had signed an arbitration agreement in a U-4. Neither arbitration provision contained a disclaimer by Volt to be bound.

In seeking to compel arbitration, defendants are attempting to reap the benefits of the documents they drafted without assuming the risks. The broad-based and clear disclaimer precludes plaintiff from relying on or enforcing the handbook and agreement, and dismisses any suggestion that the papers are binding on the drafter. Yet defendants leave it to themselves to change all the terms on a whim. At the same time, defendants seek to limit plaintiff to the forum, procedures and remedies of their own choosing. Under these circumstances, the Court should find that no agreement was reached, and decline to compel arbitration.

## CONCLUSION

For these reasons, plaintiff Andrew Curry respectfully requests that the Court deny defendants' motion to compel arbitration and stay this action.

Dated: New York, N.Y.
January 11, 2008

>BERANBAUM MENKEN BEN-ASHER & BIERMAN LLP
>Attorney for Plaintiff Andrew Curry
>By: _____
>
>JONATHAN BEN-ASHER (JB-A 4572)
>KRISTEN E. FINLON (KEF 2575)
>80 Pine Street - 32nd floor
>New York, N.Y. 10005
>Telephone: (212) 509-1616
>Facsimile: (212) 509-8088